**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **TAYLOR DUMPSON,** | |
| Plaintiff, | |
| v. | |
| **BRIAN ANDREW ADE,** | |
| **ANDREW ANGLIN, in his personal capacity and d/b/a DAILY STORMER,** | Case No. 1:18-cv-01011-RMC |
| and | |
| **MOONBASE HOLDINGS, LLC, d/b/a ANDREW ANGLIN and/or DAILY STORMER,** | |
| Defendants. | |

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT**</u>

# TABLE OF CONTENTS

Page

I.   Introduction ........................................................................................................... 1

II.  Background ............................................................................................................ 2

    A.   The Parties ..................................................................................................... 2

    B.   The Initial Hate Crime .................................................................................. 3

    C.   Andrew Anglin's Article and the Troll Storm ............................................. 4

    D.   Effects of the Hate Incident ......................................................................... 6

III. Procedural History ................................................................................................ 7

IV.  Legal Standard ...................................................................................................... 8

V.   Entry of Final Judgment and Damages By Default is Appropriate ...................... 9

    A.   Ms. Dumpson's Allegations Are Well Pled ................................................ 9

        1.   Counts I and V: Inviting Interference and/or Interfering with
             Ms. Dumpson's Right to Full and Equal Enjoyment of Places of
             Public Accommodation Under the D.C. Human Rights Act ................... 10

        2.   Counts II and VI: Inviting Interference and/or Interfering with
             Ms. Dumpson's Right to Equal Opportunity to Education under the
             DCHRA ................................................................................................ 14

        3.   Counts IV and VIII: Intentional Infliction of Emotional Distress,
             and/or Conspiracy to Commit Intentional Infliction of Emotional
             Distress ................................................................................................. 16

    B.   The Court Should Award Ms. Dumpson the Damages Requested ...................... 18

        1.   Compensatory Damages ......................................................................... 18

        2.   Attorneys' Fees ..................................................................................... 23

        3.   Punitive Damages .................................................................................. 23

            a.   Defendants' Conduct Warrants Punitive Damages ...................... 24

                i.   Anglin's Conduct Warrants Punitive Damages. .............. 25

                ii.  Moonbase's Conduct Warrants Punitive Damages ........... 27

## TABLE OF CONTENTS (CONT'D)

|   |   |   |   |
|---|---|---|---|
| | | iii. | Ade's Conduct Warrants Punitive Damages...................... 28 |
| | b. | The Court Should Award Sufficient Punitive Damages to Punish and Deter. ......................................................................... 28 |
| | | i. | Because Defendants' Defaults Blocked Ms. Dumpson's Ability to Conduct Discovery, the Court Should Not Consider Anglin, Moonbase, and Ade's Ability to Pay........................................................... 29 |
| | | ii. | The Reprehensible, Intentional, and Hateful Nature of Anglin, Moonbase, and Ade's Conduct Necessitates Substantial Punishment and Deterrence. ....................................................................... 30 |
| | | iii. | Anglin and Moonbase's Repeated, Oppressive, Hateful, and Unlawful Attacks on People of Color, Women, Religious Minorities, Members of the LGBTQ+ Community, and Immigrants—Even After Being Sued—Further Demonstrate that Substantial Punitive Damages are Necessary to Deter Their Wanton Conduct........................................... 33 |
| | | iv. | Plaintiff Requests Punitive Damages Reasonable to the Harm Incurred and Punitive Damages Awards in Other Hate Crime Cases ............................... 35 |
| | 4. | Injunctive Relief........................................................................... 39 |
| VI. | Conclusion .................................................................................................. 40 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur Young & Co. v. Sutherland,*
631 A.2d 354 (D.C. 1993) ..................................................................................27

*Blodgett v. Univ. Club,*
930 A.2d 210 (D.C. 2007) ..................................................................................11

*Boland v. Elite Terrazzo Flooring, Inc.,*
763 F. Supp. 2d 64 (D.D.C. 2011) ......................................................................9

*Daka, Inc. v. Breiner,*
711 A.2d 86 (D.C. 1998) ....................................................................24, 28, 34

*Daka, Inc. v. McCrae,*
839 A.2d 682 (D.C. 2003) ..................................................................27, 29, 30

*District of Columbia v. Wash. Hosp. Ctr.,*
722 A.2d 332(D.C. 1998) ..................................................................................18

*Doe v. De Amigos, LLC,*
987 F. Supp. 2d 12 (D.D.C. 2013) ....................................................................24

*Doe v. De Amigos, LLC,*
Civil Action No. 11-01755, 2014 WL 12785325 (D.D.C. June 10, 2014)..............23, 29, 30

*Fred A. Smith Mgmt. Co. v. Cerpe,*
957 A.2d 907 (D.C. 2008) ..................................................................................18

*Grace v. Whitaker,*
344 F. Supp. 3d 96 (D.D.C. 2018) ....................................................................39

*Ifill v. Dist. of Columbia,*
665 A.2d 185 (D.C. 1995) ............................................................................28, 39

*Ivey v. District of Columbia,*
46 A.3d 1101 (D.C. 2012) ..................................................................................19

*Jean-Baptiste v. District of Columbia,*
931 F. Supp. 2d 1 (D.D.C. 2013) ......................................................................19

*Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea,*
962 F. Supp. 2d 152 (D.D.C. 2013) ................................................................8, 9

# TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*Lyons v. Jordan,*
    524 A.2d 1199 (D.C. 1987) ..........................................................................24, 29

*Martini v. Fed. Nat. Mortg. Ass'n,*
    977 F. Supp. 464 (D.D.C. 1997), *vacated on other grounds*, 178 F.3d 1336
    (D.C. Cir. 1999) ..............................................................................................19

*Mazloum v. District of Columbia,*
    442 F. Supp. 2d 1 (D.D.C. 2006) ...............................................................10, 14

*Modern Mgmt. Co. v. Wilson,*
    997 A.2d 37 (D.C. 2010) ....................................................................................28

*Obeidallah v. Anglin,*
    No. 2:17-cv-720 (S.D. Ohio July 3, 2018)........................................................29

*Oliver v. Mustafa,*
    929 A.2d 873 (D.C. 2007) .................................................................................24

*Purcell v. Thomas,*
    928 A.2d 699 (D.C. 2007) .................................................................................17

*Robinson v. Sarisky,*
    535 A.2d 901 (D.C. 1988) ............................................................................28, 38

*Samuels v. Rayford,*
    No. CIV A 91-0365 (JHG), 1995 WL 376939 (D.D.C. Apr. 10, 1995) .................12

*Saunders v. Hudgens,*
    184 A.3d 345 (D.C. 2018) ...................................................................................9

*Sere v. Grp. Hospitalization, Inc.,*
    443 A.2d 33 (D.C. 1982) ................................................................24, 26, 27, 28

*Stephens v. McKinney,*
    502 U.S. 1093 (1992)....................................................................................36, 38

*Ventura v. L.A. Howard Constr. Co.,*
    134 F. Supp. 3d 99 (D.D.C. 2015) ...............................................................8, 9, 18

*Wash. Med. Ctr., Inc. v. Holle,*
    573 A.2d 1269 (D.C. 1990) ...............................................................................24

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

<u>Page(s)</u>

**Statutes**

D.C. Code § 2-1401.02(8)..............................................................................................15

D.C. Code § 2-1401.02(24)............................................................................................12

D.C. Code § 2-1402.01 .......................................................................................11, 14, 33

D.C. Code § 2-1402.31 ...........................................................................................12, 13

D.C. Code § 2-1402.31(a)..............................................................................................11

D.C. Code § 2-1402.31(a)(2)..........................................................................................12

D.C. Code § 2-1402.61 ......................................................................................... *passim*

D.C. Code § 2-1402.62 ......................................................................................... *passim*

D.C. Code § 2-1403.07 ..................................................................................................39

D.C. Code § 2-1403.16(a)..............................................................................................24

D.C. Code § 2-1403.16(b).......................................................................................23, 39

Ohio Rev. Code § 1705.06(H)(2) ...................................................................................8

**Rules**

Fed. R. Civ. P. 55(a) .......................................................................................................8

**Other Authorities**

Andrew Anglin, *CNN: Australian Muslim Fights Twitter 'Troll Army'*, Daily
  Stormer (Feb. 28, 2015)
  https://dailystormer.name/cnn-australian-muslim-fights-twitter-troll-army/..........................35

Andrew Anglin, *"I'm So Scared"*, Daily Stormer (Nov. 9, 2016)
  https://dailystormer.name/im-so-scared/............................................................................35

Andrew Anglin, *Massachusetts, Thursday: Please Troll This Sneaking Jew
  Holohoaxer*, Daily Stormer (Sept. 2, 2014)
  https://dailystormer.name/massachusetts-thurday-please-troll-this-sneaking-
  jew-holohoaxer/ ........................................................................................................34

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

Anna Silman, *A Timeline of Leslie Jones' Horrific Online Abuse*, The Cut (Aug.
  24, 2016)
  https://www.thecut.com/2016/08/a-timeline-of-leslie-joness-horrific-online-
  abuse.html ................................................................................................................32

*Anti-Semitic Targeting of Journalists During the 2016 Presidential Election*, ADL
  at 9 (Oct. 19, 2016)
  https://www.adl.org/sites/default/files/documents/assets/pdf/press-
  center/CR_4862_Journalism-Task-Force_v2.pdf ..................................................32

Ashley Feinberg, *This is the Daily Stormer's Playbook*, HuffPost (Dec. 13, 2017)
  https://www.huffingtonpost.com/entry/daily-stormer-
  nazistyleguide_us_5a2ece19e4b0ce3b44492f2 .......................................................25

Ben Arnold, *Kelly Marie Tran shuts down social media after vicious attacks from
  'Star Wars' trolls,* Yahoo! Entertainment (June 5, 2018)
  https://www.yahoo.com/entertainment/kelly-marie-tran-shuts-social-media-
  attacks-star-wars-trolls-160631895.html ................................................................32

Certificate for Trade Name Registration of Andrew Anglin, Ohio Secretary of
  State (Jan. 5, 2017) *available at*
  https://bizimage.sos.state.oh.us/api/image/pdf/201700502616 ..............................27

Certificate of Trade Name Registration of Daily Stormer, Ohio Secretary of State
  (Dec. 1, 2016), *available at*
  https://bizimage.sos.state.oh.us/api/image/pdf/201634004638 ..............................25

Charles R. Lawrence III, *If He Hollers Let Him Go: Regulating Racist Speech on
  Campus*, 1990 Duke L. J. 431, 461 (June 1990)....................................................30

Danielle Citron, *Hate Crimes in Cyberspace* (2014)....................................................31

Fannie Lou Hamer, Testimony before the Credentials Committee, Democratic
  National Convention (Aug. 22, 1964),
  http://americanradioworks.publicradio.org/features/sayitplain/flhamer.html .........32

*Id.; supra* § II ("Parties") ..............................................................................................17

*Keenan v. Aryan Nations*,
  Am. Compl., Case No. CV 99-441 (Idaho 1st Dist., Jan. 24, 1999)
  https://www.splcenter.org/sites/default/files/d6_legacy_files/keenanvaryannati
  ons_amcomplaint.pdf..............................................................................................37

## <u>TABLE OF AUTHORITIES (CONT'D)</u>

<u>Page(s)</u>

*Keenan v. Aryan Nations,*
    Am. Judgment, Case No. CV 99-441 (Idaho 1st Dist., Sept. 11, 2000)
    https://www.splcenter.org/sites/default/files/d6_legacy_files/keenanvaryannati
    ons_ amjudgment.pdf ............................................................................................37

*Keenan v. Aryan Nations,* SPLC
    https://www.splcenter.org/seeking-justice/case-docket/keenan-v-aryan-nations
    (last visited March 13, 2019) ..............................................................................37

Kelly Marie Tran, *I Won't Be Marginalized by Online Harassment*, N.Y. Times
    (Aug. 21, 2018)
    https://www.nytimes.com/2018/08/21/movies/kelly-marie-tran.html ....................32

Lois Beckett, *I was the target of a neo-Nazi 'troll storm'*, The Guardian (April 20,
    2014)
    https://www.theguardian.com/us-news/2017/apr/20/tanya-gersh-daily-
    stormer-richard-spencer-whitefish-montana ........................................................31

*Macedonia Baptist Church v. Christian Knights of the Ku Klux Klan,*
    2d Am. Compl., Civil Action No. 96- CP-14-217 (S.C. Ct. of Common Pleas,
    3d Cir. Dec. 29, 1997)
    https://www.splcenter.org/sites/default/files/d6_legacy_files/macedoniavkkk_
    2complaint.pdf .....................................................................................................36

*Macedonia Baptist Chuuch v. Christian Knights of the Ku Klux Klan*, SPLC
    https://www.splcenter.org/seeking-justice/case-docket/macedonia-v-christian-
    knights-ku-klux-klan (last visited March 13, 2019) ............................................37

Maeve Duggan, *Online Harassment 2017*, Pew Research Center (July 11, 2017)
    https://www.pewinternet.org/2017/07/11/online-harassment-2017/ ............................. *passim*

Mallory Simon & Sara Sidner, *Judge demands white supremacist appear in
    person for deposition. He refuses, saying he is afraid to come to US*, CNN
    (April 9, 2019)
    https://www.cnn.com/2019/04/09/us/andrew-anglin-daily-stormer-
    lawsuit/index.html ................................................................................................29

*McKinney,* Judgement, Case No. C87-565A (N.D. Ga., Oct. 25, 1988)
    https://www.splcenter.org/sites/default/files/d6_legacy_files/mckinneyvsouthe
    rn_judgment ..........................................................................................................36

## TABLE OF AUTHORITIES (CONT'D)

**Page(s)**

*McKinney v. Southern White Knights,*
Compl. Case No. C87-565A (N.D. Ga., Mar. 24, 1987)
https://www.splcenter.org/sites/default/files/d6_legacy_files/mckinneyvsouthe
rn_complaint.pdf.................................................................................................................36

*McKinney v. Southern White Knights*, SPLC
https://www.splcenter.org/seeking-justice/case-docket/mckinney-v-southern-
white-knights (last visited March 13, 2019) ........................................................................36

*Toxic Twitter - The Silencing Effect,* Amnesty Int'l, Chp.5 (March 2018)
https://www.amnesty.org/en/latest/research/2018/03/online-violence-against-
women-chapter-5/#topanchor ................................................................................................33

Zeiger and Andrew Anglin, *Hissing Jew Candidate Erin Schrode is Crying About
the Troll Army*, Daily Stormer (June 6,
2016)https://dailystormer.name/hissing-jew-candidate-erin-schrode-is-crying-
about-the-troll-army/.............................................................................................................35

## I.   INTRODUCTION

Plaintiff Taylor Dumpson respectfully requests that this Court enter a default judgment against Defendants Andrew Anglin, Moonbase Holdings, LLC ("Moonbase"), and Brian Andrew Ade for violations of the District of Columbia Human Rights Act of 1977 ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*, and District of Columbia tort law.  This is a case about white supremacy and its modern manifestation online. The District of Columbia enacted a powerful Human Rights Act to redress racial hatred and inequity stemming from the country's history, from slavery to Jim Crow, and continuing to the present day.

On May 1, 2017, just one day after being inaugurated as the first female African American student government president at American University (AU), Ms. Dumpson became the victim of a racially motivated hate crime, reminiscent of the Jim Crow era:  a masked man hung nooses with bananas inscribed with racist and threatening messages that targeted Ms. Dumpson around AU's campus.  After the media reported on the hate crime, a known neo-Nazi, Defendant Andrew Anglin, posted an article about Ms. Dumpson and the hate crime on his website, the Daily Stormer. In the article, Anglin targeted Ms. Dumpson using racist language and directed his followers to "troll storm" Ms. Dumpson by harassing her via social media.

As Anglin intended, a troll storm ensued.  Defendant Brian Andrew Ade, among others, took to social media to intimidate, threaten, and harass Ms. Dumpson with racist and demeaning messages. Instead of being able to celebrate her inauguration, Ms. Dumpson found herself fearing for her safety as intimidating comments poured in.  As a result of the exhortation to intimidate her online including the publication of her name, photo, and contact information, and the ensuing threats and harassment, Ms. Dumpson suffered severe mental and physical trauma, the impact of which touches every aspect of her life.  She was diagnosed with Post Traumatic Stress Disorder and lives in fear for her safety.

On April 30, 2018, Ms. Dumpson filed this Complaint against Defendants Brian Andrew Ade, Evan James McCarty, Andrew Anglin, and Moonbase Holdings LLC.   While McCarty responded and ultimately settled with Ms. Dumpson, no other defendant has responded to the complaint.   As such, the Clerk of Court has entered defaults against Ade, Anglin, and Moonbase. Ms. Dumpson now respectfully requests that this Court enter an order for default judgment and damages, finding these three defendants jointly and severally liable for the injuries they inflicted upon Ms. Dumpson and imposing punitive damages to punish the malicious nature of their acts and to deter them from engaging in such unlawful activities again.

## II.   BACKGROUND

### A.   The Parties

At the time of the events in question, Plaintiff Taylor Dumpson was a junior at American University and a prominent member of Alpha Kappa Alpha Sorority Inc. ("AKA"), a historically black sorority. Am. Compl. ¶ 15.  She is African American.  *Id.*

Defendant Andrew Anglin is the creator and operator of the Daily Stormer.  *Id.* ¶ 17.  The Daily Stormer is a leading white supremacist and neo-Nazi website.  *Id.* ¶¶ 18–19.  The Daily Stormer peddles and foments hate; it publishes opinion pieces interpreting current events through a racist, anti-Semitic, bigoted, and frequently misogynist lens.  *Id.* ¶ 18.  Anglin has a history of using the platform to incite his followers to hatefully "troll" racial and religious minorities in order to inflict harm upon them.  *Id.* ¶ 20.  Trolling is mocking, insulting, harassing, threatening, humiliating, defaming, and/or intimidating a targeted person through communications (typically, but not exclusively, online).  *Id.*   Trolling has a chilling effect on the targets' participation on social media sites, such as Facebook and Twitter, and interferes with their day-to-day activities. *Id.; see also* Maeve Duggan, *Online Harassment 2017*, Pew Research Center (July 11, 2017) ("For those who experience online harassment directly, these encounters can have profound real-world

consequences, ranging from mental or emotional stress to reputational damage or even fear for one's personal safety.").[1]

Defendant Moonbase Holdings, LLC is a for-profit, limited-liability corporation organized and existing under the laws of the State of Ohio.  Am. Compl. ¶ 30.  Moonbase is registered by Andrew Anglin, assists in the operation of the Daily Stormer, and provides Anglin and the Daily Stormer with financial support.  *Id.*

Defendant Brian Andrew Ade sent hateful, intimidating, and harassing messages directed at Ms. Dumpson to various Twitter accounts associated with her beginning in May 2017.  *Id.* ¶ 31.

### B.     The Initial Hate Crime

On April 30, 2017, Ms. Dumpson was inaugurated as president of the American University Student Government ("AUSG").  *Id.* ¶ 58.  Early the next morning, on May 1, 2017, a person wearing dark clothing walked around AU's campus and used nooses made of black rope to hang bananas from lampposts at several locations.  *Id.* ¶¶ 61, 63.  The bananas were labeled with phrases such as "AKA Free" (a reference to Ms. Dumpson's sorority) and/or "Harambe bait" (a reference to a gorilla that was shot and killed at the Cincinnati Zoo; comparing African Americans to apes is a common racist smear).  *Id.* ¶ 64.  Ms. Dumpson, AU, and law enforcement all believed Ms. Dumpson to be the primary target of this crime.  *Id.* ¶ 74.

In the first few days after the hate crime, Ms. Dumpson was in shock, frazzled, and exhausted.  *Id.* ¶ 79; Ex. 1 (Dumpson Decl.) ¶ 11.  She was swept into a whirlwind of activity.  Am. Compl. ¶ 79.  Ms. Dumpson gave multiple interviews to the media and attended a press conference about the hate crime with members of the Congressional Black Caucus.  *Id.* ¶¶ 81–82.  Because of the trauma of the events, she was unable to eat or sleep normally.  *Id.* ¶ 84; Dumpson

---

[1] https://www.pewinternet.org/2017/07/11/online-harassment-2017/.

Decl. ¶ 12 ("From May 1 to May 4, I only slept around 14 hours combined. I ate less than one full meal on May 1. I could not eat on May 2 or 3. I could eat only one full meal on May 4.").

### C.    Andrew Anglin's Article and the Troll Storm

At or around 7:00 P.M. on May 4, Ms. Dumpson was in her apartment by herself. She checked her phone—having not looked at it for most of the day—and discovered unusual comments from strangers on Facebook that were harassing, mocking, and trolling her.   Am. Compl. ¶ 86.   Ms. Dumpson saw an email from the Anti-Defamation League ("ADL"), a civil rights organization, which had been sent at 5:51 P.M. that day.  *Id.* ¶ 87.  In the email, ADL told her that Andrew Anglin, publisher of The Daily Stormer, had written an article about Ms. Dumpson and the hate crime.  *Id.*

In his Daily Stormer publication, Anglin mocked AU's and law enforcement's response to the hate crime.  *Id.* ¶ 89.  Anglin explicitly targeted Ms. Dumpson and encouraged his followers to do so as well, writing, "No one feels safe around bananas. Some racists have taken to calling this African Queen 'Dumpy Dumpson,' smdh [shaking my damn head]."  *Id.* ¶ 90.  Anglin included a photo of Ms. Dumpson, linked directly to Ms. Dumpson's Facebook account and the AUSG Twitter account, and continued, "Be sure to send her some words of support on Facebook, and hit up the AU Student Government on Twitter. Let her know that you fully support her struggle against bananas."  *Id.* (emphasis omitted).

As soon as she learned that a well-known white supremacist and neo-Nazi was encouraging people to troll her, Ms. Dumpson read the Daily Stormer article and had a severe panic attack. *Id*. ¶ 94.  Based on her knowledge of white supremacist violence against African Americans, Anglin's revelation of her personal details in his article, and Anglin's history of encouraging and inciting white supremacists, she was immediately afraid for her safety.  *Id.*  She was scared that someone might be coming to physically attack her at that very moment and that fear caused her to experience

intense trauma.  *Id.*  In Ms. Dumpson's words, "I bolted the door, closed the blinds, and turned off the lights. I balled up on the floor. I shook uncontrollably and rocked back and forth.  I cried." Dumpson Decl. ¶ 15.  Ms. Dumpson called AUPD, who responded to her home at around 8:30 P.M.  Am. Compl. ¶ 95.  She filed a police report.  *Id.*  The following day, Ms. Dumpson was too afraid to leave her home.  *Id.* ¶ 96.

Once Anglin wrote his first article—and continuing for days thereafter—Ms. Dumpson's Facebook account and the AU, AUSG, and AUSG President Twitter accounts were bombarded with harassing, hateful, racist, and intimidating messages.  *Id.* ¶ 97.  All of these accounts were associated with Ms. Dumpson as the recently inaugurated student government president.  Daily Stormer readers read Anglin's article and utilized the links he posted to send harassing comments to Ms. Dumpson.  *Id.* Ms. Dumpson was able to quickly change the privacy settings on her Facebook account to stop the onslaught of hate-filled messages, but the attacks against her continued on Twitter.  *Id.* ¶ 97 *see also id.* ¶¶ 99–113.  Many of the tweets tagged or responded to news reports or AU announcements of events in which Ms. Dumpson had participated (such as the Congressional Black Caucus press conference) or was likely to participate in (such as University town halls).  *Id.* ¶ 98.

Ade was one of the most prolific trolls on Twitter, and posted the following messages:

- "I beez prezdent n sheeeeit"

- "Turdler takes a Dump son"

- "OOOOOOK EEEEEK CHIMPOUT!"

- "You beez 100% sheboon!"

- "Sheeeeit I dindu nuffins she was axing fo it n sheeeit!"

- "Raccoons Rule, coons, drool"

- "Waaah, waah, Dats Rayceez!"

- "Chimpout!"
- "So in black people time, this will start whenever" (in response to a community meeting detailing Ms. Dumpson's whereabouts).

*Id.* ¶ 100.   These messages, both separately and taken as a whole are threats that are meant to intimidate Ms. Dumpson, interfere with her day to day activities, and subjugate her on the basis of her race and gender.  *Id.* ¶ 119.   Indeed, by referencing meetings that Ms. Dumpson was set to attend, some tweets indicated that Ade and others were specifically monitoring Ms. Dumpson's physical whereabouts.  Dumpson Decl. ¶ 22.  The trolling of Ms. Dumpson escalated her fear for her physical safety.  Am. Compl. ¶ 119.

### D.    Effects of the Hate Incident

These events negatively impacted "every aspect" of Ms. Dumpson's life, including her "academic studies, social interactions, and emotional and physical health."  Dumpson Decl. ¶ 32. In Ms. Dumpson's words, "At the very outset of my adulthood, Defendants caused me to live in fear. This is a trauma that may never allow my life to return to normal."  *Id.* ¶ 33.

Ms. Dumpson experienced severe trauma resulting in serious physical and emotional reactions in response to Anglin's actions and the subsequent online harassment by Ade, McCarty, and other online trolls.  Am. Compl. ¶ 120.  From June 2017 to January 2018, Ms. Dumpson lost more than 15% of her body weight as a result of this trauma, an unhealthy weight loss.  *Id.* ¶ 121. Ms. Dumpson experienced flashbacks, nightmares, depression, anxiety, and disordered eating, and engaged in avoidance behavior as a result of these events.  *Id.* ¶ 122.  Some days she was unable to carry on a conversation without having an anxiety attack, get out of bed and eat a proper meal, or do anything other than stare at the ceiling.  *Id.*   Ms. Dumpson required regular psychiatric counseling.  *Id.* ¶ 123.   Ms. Dumpson's therapist diagnosed her with Post Traumatic Stress Disorder ("PTSD").  *Id.* ¶ 124.  Ms. Dumpson feels afraid and on edge.  *Id.* ¶ 125.

As a result, Ms. Dumpson, an extrovert, was terrified of leaving her home at night for the remainder of her time in college.  *Id.* ¶ 126.  Before the hate crime, she would walk, bike, or take public transportation to commute to school and travel around town, walk around campus at night, and stay late at the library to study.  *Id.*  After the events in question, Ms. Dumpson adjusted her travel habits and incurred additional expenses such as taking car services like Uber.  *Id.*  She stopped studying at the library, avoided unnecessary trips to campus, especially at night, and was fearful when she had to navigate public spaces on campus due to fears of being attacked.  *Id.*

Ms. Dumpson remains scared of being harassed and stalked online, including on social media. *Id.* ¶ 127.  The hate crime and subsequent harassment have had a chilling effect on her online presence and self-expression and have interfered with her day-to-day activities.  *Id.* Additionally, Ms. Dumpson's academic studies suffered as a result of the hate crime and subsequent trolling, which primarily occurred just before final exams.  She missed some of her final exams, withdrew from one class, took incompletes in some others, and had to do extra work to catch up. *Id.* ¶ 128.  She had to drop her sociology minor because the subject matter became too traumatic and could have aggravated her PTSD.  *Id.*  The hate crime and trolling also impeded her preparation to attend law school.  *Id.*

## III.    PROCEDURAL HISTORY

On May 1, 2018, Ade was served in person with a summons and complaint, rendering his answer to the complaint due on May 22, 2018.  (Dkt. 7.)  Ms. Dumpson received no response from Ade.  Accordingly, on June 19, 2018, Ms. Dumpson requested that the Clerk of Court enter default for Ade (Dkt. 9), and on June 19, 2018, the Clerk of Court entered default (Dkt. 10).

Beginning in May 2018, Ms. Dumpson made extensive efforts to serve Anglin in his personal capacity and as registered agent for Moonbase, including attempting to serve Anglin in person at thirteen different addresses associated with him, and attempting to serve him via certified

mail at his P.O. Box and six addresses. On July 24, 2018, Plaintiff moved for an extension of time to serve Anglin and for permission to serve Anglin by publication, (Dkt. 14), which the Court granted on July 30, 2018, (Dkt. 15).  Service by publication was completed on November 15, 2018. (Dkt. 23.)  Ms. Dumpson moved for default against Anglin on December 10, 2018, (Dkt. 26–27), and default was entered on December 11, 2018.  (Dkt. 28.)

After Ms. Dumpson's efforts to serve Moonbase via its registered agent Anglin failed, on July 10, 2018, Ms. Dumpson served Moonbase pursuant to Ohio Rev. Code § 1705.06(H)(2). (Dkt. 19.)  Ms. Dumpson received no response from Moonbase, and accordingly, on September 25, 2018, Ms. Dumpson requested that the Clerk of Court enter default for Moonbase.  (Dkt. 18.) On October 3, 2018, the Clerk of Court entered default for Moonbase.  (Dkt. 20.)

Ms. Dumpson dismissed her claims against McCarty on January 25, 2019, after those two parties reached a settlement agreement.

## IV.   LEGAL STANDARD

"Default judgment is available when the adversary process has been halted because of an essentially unresponsive party. Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint."  *Ventura v. L.A. Howard Constr. Co.*, 134 F. Supp. 3d 99, 103 (D.D.C. 2015) (internal quotation marks and citation omitted).  "To obtain a default judgment under Federal Rule of Civil Procedure 55, a plaintiff must undertake two steps."  *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 161 (D.D.C. 2013).  "First, the plaintiff should request that the Clerk of the Court enter a default against the party who has 'failed to plead or otherwise defend' against an action."  *Id.* (quoting Fed. R. Civ. P. 55(a)).  "Once default has been entered, the plaintiff may move for default judgment."  *Id.*  After liability for the allegations in a plaintiff's well-pleaded complaint is established, the Court "must make an independent evaluation of the damages to be awarded."  *Ventura*, 134 F. Supp. 3d at 103.  To

determine damages, "a plaintiff must prove his entitlement to the relief requested using detailed affidavits or documentary evidence on which the court may rely." *Id.* (internal quotation marks and brackets omitted).

## V. ENTRY OF FINAL JUDGMENT AND DAMAGES BY DEFAULT IS APPROPRIATE

Entry of a default judgment and damages is plainly warranted here. By failing to respond to Ms. Dumpson's summons and complaint in any way, Defendants Anglin, Moonbase, and Ade have caused "the adversary process [to be] halted." *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011). Their default has thus established their liability for the well-pleaded allegations of the complaint. *Id.* As explained below, each of Ms. Dumpson's allegations against the Defendants are well pled. *See Lanny J. Davis & Assocs.*, 962 F. Supp. 2d at 161. Moreover, through evidence submitted concurrently with this motion, Ms. Dumpson has further demonstrated her "entitlement to the relief requested." *Ventura*, 134 F. Supp. 3d at 103 (internal quotation marks omitted).

### A. Ms. Dumpson's Allegations Are Well Pled

Each count of Ms. Dumpson's complaint is well pled. Ms. Dumpson's claims against Defendants Anglin, Moonbase, and Ade fall into three categories: (1) interference with enjoyment of public accommodations (Counts I and V); (2) interference with access to education (Counts II and VI); and (3) intentional infliction of emotional distress (Counts IV and VIII).[2] Ms. Dumpson

---

[2] Notably, each of these theories of liability arise from the same set of facts, and as such, Ms. Dumpson need only prevail on one in order to be entitled to damages. *See Saunders v. Hudgens*, 184 A.3d 345, 350 (D.C. 2018) (stating that a plaintiff may pursue multiple theories of liability for a single wrong).

respectfully requests that this Court enter a default judgment as to each of these counts of the complaint.[3]

### 1.   Counts I and V: Inviting Interference and/or Interfering with Ms. Dumpson's Right to Full and Equal Enjoyment of Places of Public Accommodation Under the D.C. Human Rights Act

Ms. Dumpson has properly pled that Defendants violated the D.C. Human Rights Act ("DCHRA") with respect to her right to full and equal enjoyment of places of public accommodation. Accordingly, this Court should enter Default Judgment on Counts I and V of the Complaint.

"To establish a prima facie case of . . . interference [under the DCHRA], a plaintiff must allege that: (1) [s]he engaged in activity protected under the DCHRA . . .; (2) [s]he was subjected to adverse action; and (3) there is a causal nexus between the two." *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 12–13 (D.D.C. 2006); *see also* D.C. Code §§ 2-1402.61, 2-1402.62 (declaring it unlawful to "coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected" by the DCHRA and "to require, request, or suggest that a person retaliate against, interfere with, intimidate or discriminate against a person, because that person has opposed any practice made unlawful by" the DCHRA). Here, Ms. Dumpson has stated a claim that Defendants Anglin and Moonbase invited interference and interfered with her right to equal enjoyment of

---

[3] At this time, Ms. Dumpson is not seeking a default judgment as to her allegations of *conspiracy* regarding violations of the DCHRA and *conspiracy* regarding intentional infliction of emotional distress. Similarly, at this time, Ms. Dumpson is not moving for default on the basis of her Bias-Related Crime Act claims. Ms. Dumpson does not waive her conspiracy or Bias-Related Crime allegations, but in the interests of conserving judicial resources she recognizes that her other allegations are sufficient to resolve this case.

places of public accommodation (Count I).  *See* D.C. Code § 2-1402.01 (stating that "[e]very individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to . . . in places of public accommodation.").[4]  She has also stated a claim that Defendant Ade interfered her right to equal enjoyment of places of public accommodation and aided and abetted interference with this right (Count V).   *See* D.C. Code § 2-1402.31(a) (prohibiting, *inter alia*, denial of full and equal enjoyment of places of public accommodation, or publication of statements indicating that one is unwelcome at a place of public accommodation, on the basis of protected characteristics). Because the DCHRA is a "broad remedial statute," it is "to be generously construed." *Blodgett v. Univ. Club*, 930 A.2d 210, 218 (D.C. 2007) (explaining the DCHRA is a "powerful, flexible, and far-reaching prohibition against discrimination of many kinds.").

Ms. Dumpson has alleged facts sufficient to establish a prima facie case under the DCHRA. First, Ms. Dumpson has adequately alleged that she was engaged in activity protected under the DCHRA—namely, making use of a place of public accommodation.   American University—both the campus as a whole and various constituent elements of it—is a place of public accommodation.  The DCHRA defines a place of public accommodation as including, *inter alia*, "all places included in the meaning of such terms as . . . ***restaurants or eating houses, or any place where food is sold for consumption on the premises***; . . . ***establishments dealing with goods or services of any kind***[;]  . . . ***swimming pools***; . . . amusement and ***recreation parks***, . . .

---

[4] D.C. Code § 2-1402.01 provides a substantive right to equal opportunity and is not a preamble or intent provision. The preamble/intent language is located in Subchapter I "General Provisions," § 2-1401.01 "Intent of Council." In contrast, § 2-1402.01 is in Subchapter II "Prohibited Acts of Discrimination" and titled "General." It provides a general right to be complemented with additional specific rights in the following sections.

*gymnasiums*[;] . . .  *garages*[;] . . . [and] public halls and public elevators[.]" D.C. Code § 2-1401.02(24) (emphases added).  In other words, "it must be a place that accommodates the public." *Samuels v. Rayford*, No. CIV A 91-0365 (JHG), 1995 WL 376939, at *8 (D.D.C. Apr. 10, 1995). American University houses restaurants and places where food is sold for consumption on the premises; establishments dealing with the goods or services; swimming pools; gymnasiums and recreational parks; garages; and buildings with public halls and elevators.  Am. Compl. ¶¶ 42–55, 134, 135, 195.  Some of these places span the entire campus, such as the campus' accredited public arboretum. *Id.* ¶¶ 46–47.  These places are open to both students and the public at large. *Id.* ¶¶ 42–55. Because of the large number of public accommodations spread across the campus, the public routinely uses most of the outdoor areas on campus. *Id.* ¶ 52.  The initial hate crime took place in close proximity to many of these places on AU's campus. *Id.* ¶ 135.  Moreover, many of the tweets from the troll storm were connected to places of public accommodation on the AU campus. *Id.* ¶¶ 135, 136, 196.

Second, Ms. Dumpson has properly alleged "[s]he was subjected to adverse action" that interfered with her enjoyment of a place of public accommodation. *See* D.C. Code §§ 2-1402.31, 2-1402.61, 2-1402.62.  Anglin and Moonbase directed others to harass, troll, and attack Ms. Dumpson on the internet. Am. Compl. ¶ 138. This aided and abetted the initial hate crime— itself an interference with public accommodations—by exacerbating its impact. Anglin and Moonbase "published a statement" that Ms. Dumpson's "patronage of, or presence at, a place of public accommodation is objectional, unwelcome, unacceptable, or undesirable." D.C. Code § 2-1402.31(a)(2).  Anglin and Moonbase did this with the knowledge, based on past experience, that their instructions would indeed result in actual and imminent online attacks, and that these attacks would interfere with Ms. Dumpson's enjoyment of public accommodations by causing her to feel

unsafe and afraid.   Am. Compl. ¶ 138.   Moreover, these actions did in fact interfere with Ms. Dumpson's access to AU, a place of public accommodation, by causing Ms. Dumpson to fear for her safety and by negatively impacting her academic experience and ability to socialize on campus.  *Id.* ¶¶ 139, 144.  As a result of these actions, during her final year as an AU student, Ms. Dumpson avoided unnecessary trips to campus, especially at night, and stopped studying at the library at night.  *Id.* ¶ 126. In taking these actions, Anglin and Moonbase both directly interfered with Ms. Dumpson's enjoyment of a place of public accommodation, D.C. Code §§ 2-1402.31, 2–1402.61, and invited others (*i.e.*, readers of the Daily Stormer) to interfere as well, D.C. Code § 2–1402.62.

Similarly, Ade's online attacks were part of a coordinated effort to instill fear and emotional distress in Ms. Dumpson.  Am. Compl. ¶ 198.  And the troll storm in which Ade participated did in fact cause Ms. Dumpson to feel afraid and unsafe on AU's campus.  *Id.* ¶ 201. This constitutes interference with Ms. Dumpson's enjoyment of a place of public accommodation. D.C. Code §§ 2-1402.31, 2–1402.61.   Additionally,  by sending these tweets, Ade assisted Defendants Anglin and Moonbase, as well as the other individuals sending harassing messages, by complying with Anglin's explicit charge to his readers to harass Ms. Dumpson.  Am. Compl. ¶ 200.  As such, Ade also aided and abetted interference with Ms. Dumpson's enjoyment of a place of public accommodation.  D.C. Code § 2–1402.62.

Third, the interference by all three defendants was on the basis of Ms. Dumpson's race and gender, as demonstrated by the contents of Anglin's post and the ensuing messages by Ade and others. Am. Compl. ¶¶ 139, 199.

Fourth, "there is a causal nexus" between the troll storm Defendants engaged in and Ms. Dumpson's enjoyment of American University, a place of public accommodation.

Ms. Dumpson suffered severe emotional and physical trauma because of Defendants' actions, which interfered with her ability to make use of American University's resources. *Id.* ¶¶ 144, 201. This emotional and physical trauma is described in further detail below with respect to the requested damages. *See infra* § V.B.1. Accordingly, Ms. Dumpson has stated a claim as to both Counts I and V of the Amended Complaint, and the Court should enter default judgment as to these counts.

### 2. Counts II and VI: Inviting Interference and/or Interfering with Ms. Dumpson's Right to Equal Opportunity to Education under the DCHRA

Ms. Dumpson has properly pled that Defendants violated the DCHRA with respect to her right to full and equal participation in education institutions. Accordingly, default judgment is warranted on Counts II and VI of the Complaint.

Count II in Ms. Dumpson's Complaint claims that Defendants Anglin and Moonbase invited interference and interfered with her right to equal access to an educational institution. She has also stated a claim with respect to Count V that Defendant Ade interfered with her right to equal access to an educational institution and aided and abetted interference with this right. As stated above, "[t]o establish a prima facie case of . . . interference, a plaintiff must allege that: (1) [s]he engaged in activity protected under the DCHRA . . .; (2) [s]he was subjected to adverse action; and (3) there is a causal nexus between the two. *Mazloum*, 442 F. Supp. 2d at 12–13.

First, as a student at American University, Ms. Dumpson engaged in "activity protected under the DCHRA." *Id.;* Am. Compl. ¶ 147. D.C. Code § 2-1402.01 states that "every individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, but not limited to . . . in educational institutions." As alleged in the Amended Complaint, "American University . . . is a private university located in northwest Washington, D.C." Am. Compl. ¶ 41.

The DCHRA includes "university" in its definition of educational institution.  D.C. Code § 2-1401.02(8).  As an AU student, Ms. Dumpson has a right to full and equal participation in that educational institution without interference.

Second, Ms. Dumpson has properly alleged that she was subject to "adverse action"—i.e. interference with or retaliation against her enjoyment of her right to an equal opportunity to participate in educational opportunities.

Third, because Defendants directly interfered with Ms. Dumpson's ability to participate in educational opportunities, the third element of Ms. Dumpson's prima facie case is established. *See* D.C. Code § 2-1402.61.  Anglin and Moonbase directed others to harass, troll, and attack Ms. Dumpson on the internet, and published her whereabouts on campus. *Id.* ¶ 149.  Anglin and Moonbase did this with the knowledge, based on past experience, that their instructions would indeed result in actual and imminent online attacks, and that these attacks would interfere with Ms. Dumpson's access to an educational institution by causing her to feel unsafe and afraid. *Id.* They took these actions to amplify the impact of a hate crime that was itself retaliating against Ms. Dumpson's election as student government president.  Moreover, these actions did in fact interfere with Ms. Dumpson's access to and enjoyment of AU by causing Ms. Dumpson to fear for her safety, miss exams, drop her minor in Sociology, and no longer feel safe studying on campus at night. *Id.* ¶ 151.  In taking these actions, Anglin and Moonbase directly interfered with and retaliated against Ms. Dumpson's access to and enjoyment of an educational institution, D.C. Code § 2-1402.61, and invited others (*i.e.*, readers of the Daily Stormer) to interfere as well, D.C. Code § 2-1402.62.

Similarly, Ade's online attacks were part of a coordinated effort to instill fear and emotional distress in Ms. Dumpson.  Am. Compl. ¶ 205.  The troll storm Ade participated in

caused Ms. Dumpson to feel afraid and unsafe on AU's campus, limiting her experience as student body president, and altering the course of her academic studies. *Id.* ¶¶ 206–07. Ade and others targeted Ms. Dumpson because, as student body president, she was participating fully in her right to an education. They were also targeting her in retaliation for exercising this right. *Id.* ¶ 206. This constitutes interference with and retaliation against Ms. Dumpson's access to and enjoyment of an educational institution. D.C. Code § 2–1402.61. Additionally, by sending these tweets, Ade assisted Anglin and Moonbase, as well as the other individuals sending harassing messages, by complying with Anglin's explicit charge to his readers to harass Ms. Dumpson. Am. Compl. ¶ 208. As such, Defendant Ade also aided and abetted interference with Ms. Dumpson's enjoyment of a place of public accommodation. D.C. Code § 2-1402.62.

Fourth, the interference by all three defendants was on the basis of Ms. Dumpson's race and gender, as demonstrated by the contents of Anglin's post and the ensuing messages by Ade and others. Am. Compl. ¶¶ 150, 206.

As detailed below in § V.B.1, Ms. Dumpson suffered severe emotional and physical trauma because of these actions, which interferes with her daily life. *See also id.* ¶¶ 156, 207. Accordingly, Ms. Dumpson has stated a claim as to both Counts II and VI of the Amended Complaint, and the Court should grant default judgment as to these counts.

### 3. Counts IV and VIII: Intentional Infliction of Emotional Distress, and/or Conspiracy to Commit Intentional Infliction of Emotional Distress

Ms. Dumpson has properly pled both the underlying tort of intentional infliction of emotional distress ("IIED"). Therefore, default judgment should be granted on Counts IV and VIII against Defendants.

Under D.C. law, intentional infliction of emotional distress "consists of (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes

the plaintiff severe emotional distress." *Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007) (internal quotation marks omitted). "Intent or recklessness can be inferred from the outrageousness of the acts." *Id.* (internal quotation marks omitted). "The conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* (internal quotation marks omitted).

First, Ms. Dumpson has alleged that Anglin and Moonbase encouraged harassment and online attacks on the basis of race and gender, and that this conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is intolerable in a civilized society. Am. Compl. ¶ 180. Similarly, the harassing comments posted by Ade were made on basis of race and gender, and this conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and is intolerable in a civilized society. *Id.* ¶ 231.

Second, Ms. Dumpson has alleged that the posting of the article by Anglin and Moonbase and their encouragement of harassment, threats, and intimidation was intentional. *Id.* ¶ 181. Anglin and Moonbase knew from past experience that the article would result in harassment, and directed this harassment at Ms. Dumpson specifically. *Id.; supra* § II ("Parties"). Similarly, Defendant Ade's online harassment of Ms. Dumpson was intentional, as it was directed at her specifically. *Id.* ¶ 233.

Third, Ms. Dumpson has alleged that as a direct result of the May 4, 2017 article and the subsequent online attacks it incited, she suffered severe emotional distress. *Id.* ¶¶ 182, 234; *see also infra* § V.B.1. Ms. Dumpson suffers from PTSD, disordered eating, depression, and anxiety. *Id.* Due to this intense mental trauma, she experienced an unhealthy weight loss. Am. Compl.

¶ 121. These events also had a significant negative impact on her academic experience and her ability to socialize. *Id.* ¶ 144.

**B.     The Court Should Award Ms. Dumpson the Damages Requested**

Because default judgment is warranted, the Court should award Ms. Dumpson compensatory damages, attorneys' fees, and punitive damages against Anglin, Moonbase, and Ade.  The attached declarations and exhibits demonstrate Ms. Dumpson's entitlement to damages. After liability for the allegations in a plaintiff's well-pleaded complaint is established, the Court "must make an independent evaluation of the damages to be awarded." *Ventura*, 134 F. Supp. 3d at 103.  To determine damages, "a plaintiff must prove his entitlement to the relief requested using detailed affidavits or documentary evidence on which the court may rely." *Id.* (internal quotation marks and brackets omitted).

Ms. Dumpson seeks to hold Anglin, Moonbase, and Ade jointly and severally liability for compensatory damages and attorneys' fees and costs.  Joint and several liability is proper where, as here, defendants' "independent acts combined to cause a single injury." *District of Columbia v. Wash. Hosp. Ctr.,* 722 A.2d 332, 336–337(D.C. 1998); *see also Fred A. Smith Mgmt. Co. v. Cerpe*, 957 A.2d 907, 917 (D.C. 2008) (finding defendants jointly and severally liable for attorneys' fees under the DCHRA because "the liability of the defendants arose out of a common nucleus of facts and issues").  Here, the emotion distress Ms. Dumpson suffered was caused by Anglin and Moonbase's article, which began the troll storm, and the troll storm itself, in which Ade played a crucial role.  As such, the defendants' actions combined to cause Ms. Dumpson's injuries, and they should be held jointly and severally liable.

**1.     Compensatory Damages**

Ms. Dumpson has demonstrated her entitlement to compensatory damages in the amount of $101,429.28, consisting of three types of damage.  *First*, Ms. Dumpson requests $844.76 as

compensation for the cost of therapy and medication necessitated by the hate incident.  *See* Dumpson Decl. ¶¶ 27, 35–37.  *Second*, Ms. Dumpson requests $584.52 as compensation for the cost of using Uber to travel to school and her internship after the hate crime.  *Id.* ¶ 37.  Before the hate crime, Ms. Dumpson walked or used public transportation to travel around Washington, D.C., however, after the incident, Ms. Dumpson did not feel safe doing so and instead had to travel by car.  *See id.* ¶ 30.

*Third*, Ms. Dumpson requests $100,000 for the pain and suffering she endured as a result of Defendants' actions.[5]  "[D]amages for emotional distress need not be quantified," however, "there must be a basis from which the [factfinder] can make a common-sense assessment."  *Ivey v. District of Columbia*, 46 A.3d 1101, 1109 (D.C. 2012).  Here, Ms. Dumpson has provided ample evidence that Defendants' actions (1) were the direct cause of her pain and suffering, and (2) had a drastic impact on her daily life.

As explained in her declaration, Ms. Dumpson "experienced severe trauma resulting in serious physical and emotional reactions to Anglin's blog post and the troll storm it incited." Dumpson Decl. ¶ 23.  The article caused Ms. Dumpson extreme distress the moment she learned of it.  *Id.* ¶ 15.  After finding out about the article, Ms. Dumpson "immediately feared for [her] safety and had a severe panic attack."  *Id.*  Per Ms. Dumpson, "I was afraid that someone might be coming to physically attack me at any moment, and I was alone. I bolted the door, closed the blinds, and turned off the lights. I balled up on the floor. I shook uncontrollably and rocked back

---

[5] As a point of comparison, Ms. Dumpson's request for $100,000 is similar to damages awarded for pain and suffering in other DCHRA cases in D.D.C.  *See e.g.*, *Jean-Baptiste v. District of Columbia*, 931 F. Supp. 2d 1, 21 (D.D.C. 2013) (awarding $350,000 for pain and suffering damages in a DCHRA case); *Martini v. Fed. Nat. Mortg. Ass'n*, 977 F. Supp. 464, 481 (D.D.C. 1997), *vacated on other grounds*, 178 F.3d 1336 (D.C. Cir. 1999) (allowing award of $100,000 per defendant for emotional pain and suffering for DCHRA violations).

and forth. I cried." *Id.* Ms. Dumpson's knowledge of Anglin's reputation and previous activities, including his incitement of other troll storms, made her distress particularly acute. *Id.* ¶ 16. For example, Ms. Dumpson was aware that Dylann Roof, who violently murdered nine African Americans in a church, had been an active member of the Daily Stormer community. *Id.* She also knew about the troll storm inflicted on Tanya Gersh by Andrew Anglin and the Daily Stormer. *Id.* The campaign of harassment that followed from Defendant Anglin's blog post similarly caused Ms. Dumpson great distress.   The messages, particularly those that included details about Ms. Dumpson's whereabouts, made Ms. Dumpson "feel extremely afraid" and "reinforced the trauma of the initial hate crime." *Id.* ¶ 22.

In the aftermath of this series of events, Ms. Dumpson has experienced "flashbacks, nightmares, depression, anxiety, and disordered eating, and engaged in avoidance behavior" as a result of Defendants' behavior. *Id.* ¶ 25. She required regular therapy for the remainder of her time in college and has been diagnosed with PTSD. *Id.* ¶¶ 27–28. The incident caused Ms. Dumpson to feel "constantly afraid and on edge" and take serious steps to ensure her safety. *Id.* ¶ 28. Although by nature an "extremely extroverted person," after the hate crime, Ms. Dumpson was afraid to leave her home at night, or to go anywhere alone. *Id.* ¶ 29. The fear she experienced caused her to change her routine and study habits, and impeded her academic performance. *Id.* ¶¶ 31, 32.

The actions of Defendants Anglin, Moonbase, and Ade caused Ms. Dumpson significant pain and suffering that continues to impact her life. In Ms. Dumpson's words, "At the very outset of my adulthood, Defendants caused me to live in fear. This is a trauma that may never allow my life to return to normal." *Id.* ¶ 33.

Ms. Dumpson has also been analyzed by a doctor of psychology.  On March 4 and March 11, 2019, Ms. Dumpson underwent a psychological evaluation by Michael Mintz, Psy.D. Dr. Mintz also reviewed medical records from Ms. Dumpson's psychologist and psychiatrist, both of whom she saw regularly after the on-campus hate crime and the attacks perpetrated by Defendants in this case.

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████

Dr. Mintz also reviewed the records kept by Ms. Dumpson's psychiatrist, ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████   ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



As demonstrated by Ms. Dumpson's declaration and Dr. Mintz's evaluation, Ms. Dumpson has been impacted significantly by the Defendants' actions.  As such, Ms. Dumpson requests compensatory damages in the amount of $101,429.28.

### 2.    Attorneys' Fees

Ms. Dumpson is also entitled to attorneys' fees and costs in this case.  *See* D.C. Code § 2-1403.16(b).  The attached declarations establish Ms. Dumpson's entitlement to attorneys' fees and costs in the amount of $124,022.10.  *See* Ex. 3 (Greenbaum Decl.); Ex. 4 (Corkery Decl.); Ex. 5 (Naresh Decl.).

### 3.    Punitive Damages

The Court should award punitive damages to Ms. Dumpson in this case to punish and deter the egregious and malicious nature of Defendants' acts—especially those of Defendants Anglin and Moonbase Holdings, who have a long history of maliciously inciting and engaging in such unlawful activities against others.

As a threshold matter, punitive damages can and should be awarded here.  Under D.C. law, punitive damages are available after entry of default against a defendant.  *See, e.g.*, *Doe v. De Amigos, LLC*, Civil Action No. 11-01755 (ABJ-AK), 2014 WL 12785325, at *12 (D.D.C. June

10, 2014) (ordering punitive damages following entry of default and a trial only on damages), *report and recommendation adopted*, 2014 WL 2937781 (D.D.C. July 1, 2014); *Oliver v. Mustafa*, 929 A.2d 873, 878–79 (D.C. 2007) (affirming award of punitive damages following default and a jury trial on damages); *Lyons v. Jordan*, 524 A.2d 1199, 1204 (D.C. 1987) (affirming award of punitive damages following entry of default).

Punitive damages are also available and appropriate for each of the claims raised in this motion: violations of the D.C. Human Rights Act, D.C. Code § 2-1403.16(a), and intentional infliction of emotional distress, *Oliver*, 929 A.2d at 878 n.2.

### a.       Defendants' Conduct Warrants Punitive Damages.

Punitive damages are appropriate when a plaintiff proves "the defendant acted with a mental state [of] 'evil motive or actual malice.'" *Daka, Inc. v. Breiner*, 711 A.2d 86, 98–99 (D.C. 1998) (affirming punitive damages where defendant "deliberately intended to humiliate and embarrass" plaintiff).  Further, punitive damages are warranted "when the defendant commits a tortious act 'accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury.'" *Doe v. De Amigos, LLC*, 987 F. Supp. 2d 12, 16–17 (D.D.C. 2013) (quoting *Wash. Med. Ctr.*, *Inc. v. Holle*, 573 A.2d 1269, 1284 (D.C. 1990)); *accord Breiner*, 711 A.2d at 98–99 (applying same standard for DCHRA claims). Intentional infliction of emotional distress *per se* meets the standard for punitive damages. *See Sere v. Grp. Hospitalization, Inc.*, 443 A.2d 33, 37–38 (D.C. 1982).

As discussed below, each remaining Defendant—Anglin, Moonbase, and Ade—acted in a manner that was malicious, egregious, reckless, wanton, oppressive, and that willfully disregarded Ms. Dumpson's rights. The facts of the First Amended Complaint, admitted as true by virtue of the Defendants' defaults, demonstrate their intent by clear and convincing evidence.

###### i.      Anglin's Conduct Warrants Punitive Damages.

Defendant Anglin created and runs the Daily Stormer—the most popular and prolific white supremacist and neo-Nazi website in the United States at the time of these events. Am. Compl. ¶¶ 17–19. In addition, Anglin registered the website, writes many of the articles, and oversees site operations. *Id*. ¶ 25.[6] The Daily Stormer has deliberately published articles intending to inflict harm on minorities and incite its readers to engage in illegal acts against women, minorities, and others. *Id.* ¶¶ 19, 22–28; *see also infra* § V.B.3.b.iii. Anglin and other Daily Stormer writers intentionally encouraged readers to troll minorities and women by mocking, insulting, harassing, threatening, humiliating, defaming, and/or intimidating them, usually online. *Id*. ¶ 20. The Daily Stormer's style guide instructs its authors, "if you're writing about some enemy Jew/feminist/etc., link their social media accounts" and that "[t]here should be a conscious agenda to dehumanize the enemy, to the point where people are ready to laugh at their deaths. So it isn't clear that we are doing this—as that would be a turnoff to most normal people—we rely on lulz." *Id*. ¶ 21.[7] "The basic propaganda doctrine of the site is based on Hitler's doctrine of war propaganda outlined in *Mein Kampf*," according to the style guide. Ashley Feinberg, *This is the Daily Stormer's Playbook*, HuffPost (Dec. 13, 2017).[8]

The Daily Stormer's style guide explains that while it uses irony and humor as a shield, it is earnestly advocating for the racism, misogyny, and anti-Semitism that it spouts:

---

[6] Daily Stormer was registered as a trade name under Ohio law by Defendant Anglin. Certificate of Trade Name Registration of Daily Stormer, Ohio Secretary of State (Dec. 1, 2016), *available at* https://bizimage.sos.state.oh.us/api/image/pdf/201634004638.

[7] "Lulz" is malicious humor associated with trolling. Am. Compl. ¶ 21.

[8] https://www.huffingtonpost.com/entry/daily-stormer-nazistyleguide_us_ 5a2ece19e4b0ce3b44492f2.

> The tone of the site should be light. Most people are not comfortable with material that comes across as vitriolic, raging, non-ironic hatred. The unindoctrinated should not be able to tell if we are joking or not. . . . This is obviously a ploy and I actually do want to gas kikes. But that's neither here nor there.

*Id*. The Daily Stormer makes clear that they are not joking: "Again, if the article is entirely serious, it should not contain dehumanizing language. Dehumanization is extremely important, but it must be done within the confines of lulz." *Id*.

Anglin published the articles targeting Ms. Dumpson out of racism and misogyny, to mock the hate crime, to harm, and to intentionally incite others to harass Ms. Dumpson unlawfully. Am. Compl. ¶¶ 89, 137–44, 149–58, 162–77.  He included her picture, linked to her Facebook account and the AUSG Twitter account, and explicitly instructed his followers to troll her on these platforms. *Id*. ¶¶ 90–91. Anglin intended his actions to encourage his followers to immediately take unlawful acts against Ms. Dumpson, knowing they would do so. *Id*. ¶ 92. This is the Daily Stormer's strategy: "If you post their social media information, some of our readers will send them messages. . . . You can then drag this out with follow-up articles, which will create continual news coverage for the site as long as you can keep it going." Feinberg, *supra*. Anglin was proud of the attacks at issue here, writing in response to media coverage that discussed his role in directing the troll storm he "want[ed] to thank . . . The Root for writing a resume for me." Am. Compl. ¶ 118. Anglin's actions demonstrated his malicious intent to intimidate, threaten, and subjugate Ms. Dumpson on the basis of her race and gender, to violate her legal rights, and to incite others to do the same. *Id*. ¶¶ 119, 137–44, 149–58, 162–77.  Anglin's intentional infliction of emotional distress on Ms. Dumpson are *per se* "willful and outrageous conduct" meriting punitive damages. *Sere*, 443 A.2d at 37–38.

###### ii.      Moonbase's Conduct Warrants Punitive Damages

Moonbase was created by Anglin for the sole purpose of operating and providing financial support for the Daily Stormer. *Id.* ¶ 30. Moonbase has registered Anglin's name as a trade name under Ohio law.[9]

Punitive damages against a company are merited in situations like this case, where "supervisory personnel both participated in and otherwise condoned" violations of the DCHRA. *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 372–73 (D.C. 1993). "Even if … [defendant company] and its predatory manager were [not] *in pari delicto*, the evidence of malice or reckless indifference on [defendant company's] part was fully sufficient to sustain an award of punitive damages." *Daka, Inc. v. McCrae*, 839 A.2d 682, 696–97 (D.C. 2003).

Moonbase's role in operating and providing financial support to the Daily Stormer helped make it possible for Daily Stormer authors to target Ms. Dumpson. By funding and operating the Daily Stormer, Moonbase intended to intimidate, threaten, and subjugate Ms. Dumpson on the basis of her race and gender and to violate her legal rights, and to incite others to do the same. Am. Compl. ¶¶ 119, 137–44, 149–58, 162–77. Moonbase, through its direct knowledge of the nature and purpose of the Daily Stormer, direct operation by Anglin, and publication of the articles targeting Ms. Dumpson, acted either with the same malice as its authors or reckless indifference to Ms. Dumpson's rights. *See McCrae*, 839 A.2d at 696–97; *Arthur Young*, 631 A.2d at 372–73. Again, Moonbase's intentional infliction of emotional distress against Ms. Dumpson is *per se* "willful and outrageous conduct" meriting punitive damages. *Sere*, 443 A.2d at 37–38.

---

[9] Certificate for Trade Name Registration of Andrew Anglin, Ohio Secretary of State (Jan. 5, 2017), *available at* https://bizimage.sos.state.oh.us/api/image/pdf/201700502616.

### iii.    Ade's Conduct Warrants Punitive Damages

Ade intentionally sent hateful, intimidating, and harassing messages to Ms. Dumpson on Twitter. Am. Compl. ¶ 31. His tweets used racist language and stereotypes intended to oppress and intimidate Ms. Dumpson. *Id.* ¶ 100; *see also supra* § II.C (listing tweets). His actions were part of a coordinated and intentional effort to violate Ms. Dumpson's legal rights and to instill fear and emotional distress in Ms. Dumpson, targeting Ms. Dumpson on the basis of her race and gender. *Id.* ¶¶ 198–201, 205–09, 214–27.   Ade's intentional infliction of emotional distress is *per se* "willful and outrageous conduct" meriting punitive damages. *Sere*, 443 A.2d at 37–38.

### b.    The Court Should Award Sufficient Punitive Damages to Punish and Deter.

The amount of punitive damages is left to the factfinder's discretion. *See Breiner*, 711 A.2d at 99. The factfinder should consider the two basic purposes of punitive damages—punishment and deterrence—as well as other relevant factors, such as the defendant's state of mind, the nature of the wrongful conduct, the duration and cost of the litigation, the plaintiff's attorneys' fees,[10] the profitability of the defendant's misconduct, and the wealth of the defendant. *Jonathan Woodner*, 665 A.2d at 941 n.19; *Robinson v. Sarisky*, 535 A.2d 901, 907 (D.C. 1988).

To ensure that a punitive damages award is constitutional, courts must ensure the award punishes truly reprehensible conduct, is reasonably proportionate to the harm suffered, and advances a state policy concern, such as the protection of the public through deterrence of the wrongful conduct. *See Modern Mgmt. Co. v. Wilson*, 997 A.2d 37, 45 (D.C. 2010). The award must not be "grossly out of proportion to the severity of the offense" but there is no bright line ratio or limit. *Id.* at 45, 52.

---

[10] As discussed in detail in *supra* § V.B.2, Plaintiff's attorneys' fees and costs are $124,022.10.

**i.     Because Defendants' Defaults Blocked Ms. Dumpson's Ability to Conduct Discovery, the Court Should Not Consider Anglin, Moonbase, and Ade's Ability to Pay.**

A defendant's net worth does not factor in to the calculus in a case where the plaintiff has not "invoke[d] the defendant's wealth." *McCrae*, 839 A.2d at 694–95.  Even when ability to pay is a factor, it "is only one of several considerations relevant to a punitive damages consideration." *Id*.  Where a defendant has failed to answer and made it impossible to determine net worth, D.C. courts have awarded punitive damages irrespective of net worth where the facts demonstrate the requisite state of mind.  *De Amigos LLC*, 2014 WL 12785325 at * 4 (citing *Lyons*, 524 A.2d at 1204).  Because Anglin, Moonbase, and Ade have defaulted and Ms. Dumpson has not made their wealth an issue in this case, the Court should not consider their ability to pay.

If the Court does want to consider ability to pay, however, it must account for the fact that Ms. Dumpson has limited information about the Defendants' finances given their defaults.  *See id*. Anglin has defaulted in the *Obeidallah* and *Sines v. Kessler* cases, and is threatening to do the same in *Gersh*.  *See Obeidallah v. Anglin*, No. 2:17-cv-720 (S.D. Ohio July 3, 2018); *Sines v. Kessler*, Clerk's Entry of Default as to Defendants Andrew Anglin and Moonbase Holdings LLC, Civil Action No. 3:17-cv-00072 (W.D.Va. March 3, 2018);[11] Mallory Simon & Sara Sidner, *Judge demands white supremacist appear in person for deposition. He refuses, saying he is afraid to come to US*, CNN (Apr. 9, 2019).[12]  Trying to measure Anglin, Moonbase, and Ade's ability to

---

[11] *Sines* alleged that Defendants Anglin and Moonbase Holdings conspired with others to violate the civil rights of plaintiffs at the August 2017 Unite the Right rally in Charlottesville, VA. *See Sines*, Amended Complaint, Civil Action No. 3:17-cv-00072-NKM, ¶¶ 336-53 (W.D.Va. Jan. 5, 2018).

[12] https://www.cnn.com/2019/04/09/us/andrew-anglin-daily-stormer-lawsuit/index.html.

pay based on incomplete information, with no access to financial records, raises equity and fairness concerns, and would reward unscrupulous behavior. [13]

> ii.     **The Reprehensible, Intentional, and Hateful Nature of Anglin, Moonbase, and Ade's Conduct Necessitates Substantial Punishment and Deterrence.**

Ms. Dumpson's injuries here are a product of vicious white supremacy and were the result of Defendants' intentional and hateful targeting of her. The country's history, from slavery to Jim Crow, and the ongoing, present-day perpetuation of racial hatred and inequity are why the District of Columbia has enacted a powerful Human Rights Act.  The actions of Anglin, Moonbase, and Ade are new in form but not substance. By directing hateful threats and harassment online at Ms. Dumpson, they and others followed the same script as generations of white supremacists that assaulted activists at lunch counters, defaced houses of worship, and berated children on their way to school.  They sought not just to threaten Ms. Dumpson, but to make a public example of her to intimidate, subjugate, and oppress all people of color, especially women of color.   There is substantial injury "inflicted by words that remind the world that you are fair game for physical attack, evoke in you all of the millions of cultural lessons regarding your inferiority that you have so painstakingly repressed, and imprint upon you a badge of servitude and subservience for all the world to see." Charles R. Lawrence III, *If He Hollers Let Him Go: Regulating Racist Speech on Campus*, 1990 Duke L. J. 431, 461 (June 1990).

Punitive damages here are particularly appropriate given the wide-spread impact of hateful online activities and troll storms like that in this case. Online threats and harassment similar to the

---

[13] To the extent the Court has questions about Anglin, Moonbase, and Ade's ability to pay, Plaintiff requests the opportunity to conduct discovery on that issue. However, the Court need not pursue this line of inquiry to resolve this case. *See De Amigos LLC*, 2014 WL 12785325, at * 4; *McCrae*, 839 A.2d at 694-95.

messages targeted at Ms. Dumpson cause significant harm not just to the direct victim, as described above, but also to the friends and family of those targeted, to anyone who shares a social identity with the victim, and to the public at large. "Networked technologies exponentially expand the audience for cyber harassment . . . . [harassing] [p]osts that go viral attract hundreds of thousands of readers." Danielle Citron, *Hate Crimes in Cyberspace,* at 5 (2014). For example, Tanya Gersh, who was also targeted by Anglin and Moonbase, said, "My husband and I sat on our bed in our bedroom and cried, thinking: what are we supposed to say to the kids when we wake them? That we're running in the middle of the night and could possibly be in the greatest of dangers? Do we tell our children that we're running in the middle of the night because we're Jewish?" Tanya Gersh as told to Lois Beckett, *I was the target of a neo-Nazi 'troll storm'*, The Guardian (April 20, 2017).[14]

In addition to the fact that hate crimes are reprehensible because of the fear they instill in both the targeted individual as well as others sharing that social identity, Defendants' actions are also particularly reprehensible as targets of such unlawful activities, including Ms. Dumpson, must often restrict their own speech and civic participation to protect themselves from the growing hate online. "I am constantly scared of being harassed and stalked online, including on social media. The hate crime and subsequent harassment have had a chilling effect on my online presence and self-expression and have interfered with my day-to-day activities." Dumpson Decl. ¶ 30. Others, such as journalist Jonathan Weisman, comedian Leslie Jones, and actor Kelly Marie Tran have similarly restricted their own activity online. *See* Anna Silman, *A Timeline of Leslie Jones's*

---

[14] https://www.theguardian.com/us-news/2017/apr/20/tanya-gersh-daily-stormer-richard-spencer-whitefish-montana.

*Horrific Online Abuse*, The Cut (Aug. 24, 2016);[15] *Anti-Semitic Targeting of Journalists During the 2016 Presidential Election*, ADL, at 9 (Oct. 19, 2016);[16] Kelly Marie Tran, *I Won't Be Marginalized by Online Harassment*, N.Y. Times (Aug. 21, 2018);[17] Ben Arnold, *Kelly Marie Tran shuts down social media after vicious attacks from 'Star Wars' trolls*, Yahoo! Entertainment (June 5, 2018).[18]   Sadly, the use of communications technology to subjugate people of color and cause them to withdraw is not new. *See* Fannie Lou Hamer, Testimony before the Credentials Committee, Democratic National Convention (Aug. 22, 1964) ("Is this America . . . where we have to sleep with our telephones off the hooks because our lives be threatened daily, because we want to live as decent human beings, in America?").[19]

The broad secondary audience for online harassment can cause wide-ranging intimidation and chilling effects. "Around one-quarter of Americans (27%) say they have decided not to post something online after witnessing the harassment of others, while more than one-in-ten (13%) say they have stopped using an online service after witnessing other users engage in harassing behaviors." Maeve Duggan, *Online Harassment 2017*, Pew Research Center (July 11, 2017).[20] People of color or women may preemptively self-censor out of fear that they too may be targeted, impeding their ability "to participate fully in the economic, cultural and intellectual life of the

---

[15] https://www.thecut.com/2016/08/a-timeline-of-leslie-joness-horrific-online-abuse.html.

[16] https://www.adl.org/sites/default/files/documents/assets/pdf/press-center/CR_4862_Journalism-Task-Force_v2.pdf.

[17] https://www.nytimes.com/2018/08/21/movies/kelly-marie-tran.html.

[18] https://www.yahoo.com/entertainment/kelly-marie-tran-shuts-social-media-attacks-star-wars-trolls-160631895.html.

[19] http://americanradioworks.publicradio.org/features/sayitplain/flhamer.html.

[20] http://www.pewinternet.org/2017/07/11/online-harassment-2017/.

District." D.C. Code § 2-1402.01. After "experienc[ing] online abuse or harassment, between 63% and 83% [of] women in the eight countries polled made some changes to the way they used social media platforms, with the figures for the USA and UK being 81% and 78% respectively." *Toxic Twitter – The Silencing Effect*, Amnesty Int'l, Chp. 5 (March 2018).[21] "35% of women in the USA" who had been targeted said "they had stopped posting content that expressed their opinion on certain issues." *Id.* "When victims shut down social media platforms like Facebook, LinkedIn, and Twitter, they are saddled with low social media influence scores that can impair their ability to obtain employment." Citron, *supra*, at 9. Individuals targeted by online hateful harassment may be forced to change schools, suffer harm to their businesses, lose their jobs, or have difficulty finding a job. *Id.* at 7–10.

The attacks on Ms. Dumpson were high-profile discriminatory attacks on her race and gender—not just on her as an individual—and therefore they produce oppression on a large scale and are particularly reprehensible. Hateful online harassment of this nature intimidates women, people of color, and others into silence, infringing their freedom to express themselves and denying their right to fully and equally participate in online communities and the online economy. Because these sorts of online attacks have pernicious and pervasive effects at a societal level, substantial punitive damages are necessary to punish Defendants and to deter them and others from engaging in these unlawful activities.

> iii. **Anglin and Moonbase's Repeated, Oppressive, Hateful, and Unlawful Attacks on People of Color, Women, Religious Minorities, Members of the LGBTQ+ Community, and Immigrants—Even After Being Sued— Further Demonstrate that Substantial Punitive Damages are Necessary to Deter Their Wanton Conduct.**

---

[21] https://www.amnesty.org/en/latest/research/2018/03/online-violence-against-women-chapter-5/#topanchor.

Sizable punitive damages are particularly necessary to deter Anglin and Moonbase, given the large audience of the Daily Stormer and these Defendants' history of repeatedly and egregiously promoting and inciting online harassment, troll storms, and other unlawful activities targeting women, people of color, Jews, Muslims, journalists, and others. The Daily Stormer's style guide discusses trolling and recognizes incitement as a fundamental part of the site's business model: "A core element of our success in drawing attention to ourselves has been in isolating individual targets and maximizing pressure on them." Feinberg, *supra.* These Defendants continued engaging in these unlawful activities *even after being sued by some of their victims. Id.* ("This can apparently result in lawsuits, which we can win, and which cause maximum media. The Tanya Gersh incident was the most famous of these incidents, though we have done it consistently since I started the site."); *see also Breiner*, 711 A.2d at 99 ("Indeed, the fact that [defendant] persisted in his hostile comments even after [plaintiff] urged him to stop is perhaps the strongest single piece of evidence supporting the jury's finding of malice.").

The Daily Stormer regularly targets individuals for harassment, threats, and other unlawful acts. *See* App'x A.[22]  For example:

- Sept. 2, 2014: Anglin urges followers to go to a synagogue and confront an author who wrote about his father, a Holocaust survivor. "These people need to be shut down! Make them afraid to tell their lies publicly!" Andrew Anglin, *Massachusetts, Thursday: Please Troll This Sneaking Jew Holohoaxer*, Daily Stormer (Sept. 2, 2014).[23]

---

[22] Due to Defendants' defaults stymieing investigation, Plaintiff cannot assert that the identified examples are exhaustive and suspects they are only a sampling.

[23] https://dailystormer.name/massachusetts-thurday-please-troll-this-sneaking-jew-holohoaxer/.

- Feb. 28, 2015: Anglin discussed an ongoing "operation" targeting a Muslim woman and told his followers to "Continue the fight!" Andrew Anglin, *CNN: Australian Muslim Fights Twitter 'Troll Army'*, Daily Stormer (Feb. 28, 2015).[24]

- June 3, 2016: Anglin and other Daily Stormer authors begin publishing articles inciting their followers to threaten Jewish female congressional candidate Erin Schoede. Am. Compl. ¶ 28; *see also* Zeiger and Andrew Anglin, *Hissing Jew Candidate Erin Schrode is Crying About the Troll Army*, Daily Stormer (June 6, 2016).[25]

- Nov. 9, 2016: Anglin linked to tweets from over 50 individuals—including many people of color, women, and LGBTQ+ individuals—responding to the 2016 election results, observing, "You can troll these people and definitely get some of them to kill themselves." Andrew Anglin, *"I'm So Scared"*, Daily Stormer (Nov. 9, 2016).[26]

- Beginning in December 2016, Anglin and the Daily Stormer published 30 articles inciting a troll storm against Jewish female realtor Tanya Gersh and her family. Gersh sued Anglin on April 18, 2017. Am. Compl. ¶¶ 25–26.

           **iv.**    **Plaintiff Requests Punitive Damages Reasonable to the Harm Incurred and Punitive Damages Awards in Other Hate Crime Cases**

As a reference point for determining punitive damages—and recognizing the Court's discretion—cases against the Ku Klux Klan and other white supremacist organizations may be instructive. As discussed above, the Daily Stormer was the most popular white supremacist and neo-Nazi website in the United States at the time of the events in this case, and the form of online

---

[24] https://dailystormer.name/cnn-australian-muslim-fights-twitter-troll-army/.

[25] https://dailystormer.name/hissing-jew-candidate-erin-schrode-is-crying-about-the-troll-army/.

[26] https://dailystormer.name/im-so-scared/.

white supremacy that it espouses is a modern descendant of the KKK's philosophy of intimidation and subjugation of people of color and other minorities. Plaintiff recognizes that her injuries are not as severe as some of these examples, but the malice of the Defendants is the same.

In *McKinney v. Southern White Knights*, Klansmen threw rocks and bottles and harassed an interracial group marching to protest racial discrimination in Georgia in 1987. Compl., Case No. C87-565A (N.D. Ga., Mar. 24, 1987);[27] *McKinney v. Southern White Knights*, SPLC.[28] The court awarded $2,500 in compensatory damages and $831,578.92 in punitive damages in 1988. *McKinney*, Judgment, Case No. C87-565A (N.D. Ga., Oct. 25, 1988),[29] *aff'd.* 934 F.2d 1265 (11th Cir. 1991), *cert. denied*, *Stephens v. McKinney*, 502 U.S. 1093 (1992). Most of the punitive damages (over $700,000) fell on the KKK organizations. *Id*. Adjusted for inflation, this judgment amounts to $5,371.98 in compensatory damages and $1,786,889.47 in punitive damages in 2019 dollars. *See* US Inflation Calculator.[30]

*Macedonia Baptist Church v. Christian Knights of the Ku Klux Klan* was a civil action for a 1995 arson of a South Carolina black church by members of the KKK, following the encouragement of their leader. 2d Am. Compl., Civil Action No. 96-CP-14-217 (S.C. Ct. of Common Pleas, 3d. Cir., Dec. 29, 1997).[31] Ultimately, Plaintiffs were awarded $300,000 in

---

[27] https://www.splcenter.org/sites/default/files/d6_legacy_files/mckinneyvsouthern_complaint .pdf.

[28] https://www.splcenter.org/seeking-justice/case-docket/mckinney-v-southern-white-knights (last visited March 13, 2019).

[29] https://www.splcenter.org/sites/default/files/d6_legacy_files/mckinneyvsouthern_judgment .pdf.

[30] https://www.usinflationcalculator.com/ (last visited April 17, 2019)

[31] https://www.splcenter.org/sites/default/files/d6_legacy_files/macedoniavkkk_2complaint.pdf.

compensatory damages and $21.5 million in punitive damages. *See Macedonia v. Christian Knights of the Ku Klux Klan*, SPLC;[32] Judgment, *Macedonia Baptist Church v. Christian Knights of the Ku Klux Klan*, Civil Action No. 96-CP-14-217 (S.C. Ct. of Common Pleas, 3d. Cir., July 24, 1998).[33] The judgment divided the vast majority of the punitive damages between the KKK and the KKK leader who encouraged the unlawful act, with individual actors shouldering smaller punitive damages awards. *See Macedonia*, 2d. Am. Compl. ¶ 20.a; Judgment at 2. Adjusted for inflation, this amended judgment amounts to $467,856.44 in compensatory damages and $33,061,855.21 in punitive damages in 2019 dollars. *See* US Inflation Calculator.[34]

In *Keenan v. Aryan Nations*, after a family stopped its car near a neo-Nazi compound in Idaho, Aryan Nations' members opened fire on them and then held them at gunpoint. A trial found the defendants grossly negligent in supervising the compounds' guards. Am. Compl., Case No. CV 99-441 (Idaho 1st Dist., Jan. 24, 1999);[35] Am. Judgment, Case No. CV 99-441 (Idaho 1st Dist., Sept. 11, 2000);[36] *Keenan v. Aryan Nations*, SPLC.[37] The plaintiffs' injuries involved psychological trauma and severe emotional distress, *Keenan*, Am. Compl. ¶¶ 22–23; however, there was no allegation in the complaint that the plaintiffs were people of color or that the unlawful

---

[32] https://www.splcenter.org/seeking-justice/case-docket/macedonia-v-christian-knights-ku-klux-klan (last visited March 13, 2019).

[33] https://www.splcenter.org/sites/default/files/d6_legacy_files/macedoniavkkk_judgment.pdf

[34] https://www.usinflationcalculator.com/ (last visited April 17, 2019).

[35] https://www.splcenter.org/sites/default/files/d6_legacy_files/keenanvaryannations_amcomplaint.pdf.

[36] https://www.splcenter.org/sites/default/files/d6_legacy_files/keenanvaryannations_amjudgment.pdf.

[37] https://www.splcenter.org/seeking-justice/case-docket/keenan-v-aryan-nations (last visited March 13, 2019).

acts were motivated by bias. The court awarded plaintiffs $330,000 in compensatory damages and $6 million in punitive damages in 2000. Am. Judgment. Adjusted for inflation, this judgment amounts to $487,146.89 in compensatory damages and $8,857,212.54 in punitive damages in 2019 dollars. *See* US Inflation Calculator.[38]

As demonstrated by Ms. Dumpson's compensatory damages request, *see supra* § V.B.1, Ms. Dumpson's injuries are not as severe as the damages in *Macedonia* or *Keenan* but are more severe than the damages in *McKinney*. But punitive damages are measured to punish and deter, *Robinson*, 535 A.2d at 907, and as such the Court should focus on Defendants' motives, actions, capabilities, and potentials for recidivism.

As discussed above, Defendant Anglin and Defendant Moonbase Holdings' actions continue a long history of white supremacists inciting harassment and threats that have the cumulative effect of creating an environment of fear, intimidation, and hatred that causes people of color, women, religious minorities, immigrants, members of the LGBTQ+ community, and others to be treated unequally in the public square, the academy, and the marketplace.

Because the Internet massively reduces transaction costs for disseminating information and communications, it is easy for Defendants to frequently engage in this unlawful behavior. In a pre-Internet world, the transaction costs of intimidating entire populations across the country with a single act was higher; it would require a high-profile and severe hate crime that made national news. Now, with the click of a button, Defendants Anglin and Moonbase Holdings can target anyone who happens to come onto their radar and watch as the viral incident ripples across the Internet. These Defendants engage in these practices again and again.

---

[38] https://www.usinflationcalculator.com/ (last visited April 17, 2019).

High frequency, low magnitude events can cause as much harm in aggregate as low frequency, high magnitude events. But the costs to bring a civil action against every low magnitude violation is prohibitive; one function of punitive damages is to resolve this challenge.

For the reasons discussed above, and recognizing the factfinder's discretion to grant a greater or lesser award, Plaintiff asks the Court to award $1,500,000 in punitive damages against Defendants Anglin and Moonbase Holdings, jointly and severally; and $100,000 in punitive damages against Defendant Ade.

### 4.    Injunctive Relief

Injunctive relief is merited in this case.  D.C. Code § 2-1403.16(b) (permitting injunctive relief under DCHRA, D.C. Code § 2-1403.07) "Injunctive relief is committed to the sound discretion of the trial court[.]" *Ifill v. Dist. of Columbia*, 665 A.2d 185, 187 (D.C. 1995). The District of Columbia's law of remedies enables the Court to order equitable relief when there is no adequate remedy at law, the balance of equities favors the movant, and success on the merits has been demonstrated. *Id.*; *see also Grace v. Whitaker*, 344 F. Supp. 3d 96, 145 (D.D.C. 2018) (citing 4-factor permanent injunction test). Plaintiff requests a preservation order and a restraining order.

Plaintiff requests the Court order Anglin and Moonbase Holdings to preserve all property—including intellectual property— associated with The Daily Stormer until Plaintiff has fully collected any Judgment awarded by this Court. The intellectual property of The Daily Stormer is an asset and any destruction of it would unlawfully obstruct Plaintiff's ability to obtain full restitution in this case.  Without a preservation order, there is a risk of intellectual property being destroyed that could otherwise be available during the collection of a Judgment.

Plaintiff further requests the Court impose a restraining order on all remaining Defendants prohibiting them from (1) communicating directly with Plaintiff; and (2) publishing any public statements involving Plaintiff that (a) are defamatory, threatening, intimidating, harassing, or

39

bullying; (b) interfere with Plaintiff's equal enjoyment of public accommodations; (c) incite unlawful acts; or (d) are otherwise unlawful. Given Anglin and the Daily Stormer's history and practices, a restraining order is necessary to prevent further acts that would exacerbate Plaintiff's PTSD or inflict additional harm. Such an order is narrowly tailored to speech likely to cause harm or that is otherwise not constitutionally protected, and serves the District's compelling interest in enforcing its Human Rights Act and protecting civil rights.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court enter the proposed order for default judgment and compensatory damages in the amount of $101,429.28 against Defendants Ade, Anglin, and Moonbase, jointly and severally; $124,022.10 in fees and costs against Defendants Ade, Anglin, and Moonbase, jointly and severally; grant $1,500,000 in punitive damages against Defendants Anglin and Moonbase Holdings, jointly and severally, and $100,000 in punitive damages against Defendant Ade; enter the proposed order for injunctive relief; and grant such other relief this Court deems necessary.

Dated: April 29, 2019                            Respectfully submitted,

                                                 */s/ Ragan Naresh*
                                                 Jon Greenbaum (D.C. Bar No. 489887)
                                                 David Brody (D.C. Bar No. 1021476)
                                                 Arusha Gordon (D.C. Bar No. 1035129)
                                                 **LAWYERS' COMMITTEE FOR CIVIL
                                                 RIGHTS UNDER LAW**
                                                 1500 K St. NW, Suite 900
                                                 Washington, DC 20005
                                                 (202) 662-8600
                                                 dbrody@lawyerscommittee.org
                                                 agordon@lawyerscommittee.org

                                                 Dennis A. Corkery (D.C. Bar No. 1016991)
                                                 Jonathan Smith (D.C. Bar No. 396578)

**WASHINGTON LAWYERS'
COMMITTEE FOR CIVIL RIGHTS AND
URBAN AFFAIRS**
11 Dupont Circle, Suite 400
Washington, D.C. 20036
(202) 319-1000
Dennis_Corkery@washlaw.org
Jonathan_Smith@washlaw.org

Emily Hughes (D.C. Bar No. 984580)
Ragan Naresh (D.C. Bar No. 984732)
Tracie Bryant (D.C. Bar No. 1018783)
Brian Gold (D.C. Bar No. 1033742)
Katherine Canning (D.C. Bar No. 198696)*
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Ave. NW
Washington, D.C. 20004
(202) 389-5000
emily.hughes@kirkland.com
ragan.naresh@kirkland.com
tracie.bryant@kirkland.com
brian.gold@kirkland.com
katherine.canning@kirkland.com

*Application for admission to this Court
pending.

## APPENDIX A

### Additional Examples of Targeting and Harassment by Anglin and Moonbase

- On September 2, 2014, Anglin urged his followers to show up at a synagogue and confront Michael Kopiec, who was holding a book talk about his father, a Holocaust survivor. "These people need to be shut down! Make them afraid to tell their lies publicly!" Andrew Anglin, *Massachusetts, Thursday: Please Troll This Sneaking Jew Holohoaxer*, Daily Stormer (Sept. 2, 2014).[1]

- On October 21, 2014, Anglin targeted British Member of Parliament Luciana Berger, who is Jewish, and instructed his followers on how to use Twitter to troll her. Andrew Anglin, *Operation: Filthy Jew Bitch – A National Action Soldier has Been Jailed for Calling a Jew a Jew, and We Must Resist*, Daily Stormer (Oct. 21, 2014).[2] Other Daily Stormer authors lauded the accomplishments of the "Stormer Troll Army." Lee Rogers, *Intellectuals Take Note: The Stormer Troll Army has Achieved Numerous Victories Against the Jewish Enemy*, Daily Stormer (Nov. 13, 2014).[3]

- On February 28, 2015, Anglin discussed an ongoing "operation" targeting Muslim woman Mariam Veiszadeh, commented on news reports of the online harassment, and told his followers to "Continue the fight!" Andrew Anglin, *CNN: Australian Muslim Fights Twitter 'Troll Army'*, Daily Stormer (Feb. 28, 2015).[4]

---

[1] https://dailystormer.name/massachusetts-thurday-please-troll-this-sneaking-jew-holohoaxer/.
[2] https://dailystormer.name/operation-filthy-jew-bitch-a-national-action-solider-has-been-jailed-for-calling-a-jew-a-jew-and-we-must-resist/.
[3] https://dailystormer.name/intellectuals-take-note-the-stormer-troll-army-has-achieved-numerous-victories-against-the-jewish-enemy/.
[4] https://dailystormer.name/cnn-australian-muslim-fights-twitter-troll-army/.

- On April 6, 2015, Anglin targeted woman of color Sarah Sahim as well as several individuals who supported her online, writing, "But the game has changed now. Because Whites now have a Troll Army." Andrew Anglin, *Gaggle of Subhuman Filth Rallies Around Ugly Curry-Negress Sarah Sahim as She Flees the Troll Army*, Daily Stormer (Apr. 6, 2015).[5]

- On April 18, 2015, the "National Youth Front" discussed how it organized harassment of Appalachian State University Chancellor Dr. Sheri N. Everts in response to diversity-promoting bulletin boards on campus, and subsequently posted neo-Nazi and white supremacist flyers on the boards. NYF, *National Youth Front's Operation Bully Board*, Daily Stormer (April 18, 2015).[6]

- On April 23, 2016, Anglin organized a "raid" by a troll army to interfere with the business operations of National Review Online, particularly Jewish editor Jonah Goldberg and journalist David French, with the intent to "[d]rive off as much of the NRO readership as possible" and "[o]verwhelm the site." Andrew Anglin, *Trolls, Assemble: NRO Raid Time Again!*, Daily Stormer (April 23, 2016).[7]

- On April 28, 2016, Anglin began targeting Jewish female journalist Julia Ioffe's Facebook and Twitter accounts, writing, "Please go ahead and send her a tweet and let her know what your think of her dirty kike trickery. Make sure to identify her as a Jew working against White interests, or send her the picture with the Jude star from the top of this article. . . . Gogoogogogoogogogo." Andrew Anglin, *Empress Melania Attacked by Filthy Russian Kike Julia Ioffe in GQ!*, Daily Stormer (April 28, 2016);[8] First Am. Compl. ¶ 28. Ioffe became a

---

[5] https://dailystormer.name/gaggle-of-subhuman-filth-rallies-around-ugly-curry-negress-sarah-sahim-as-she-flees-the-troll-army/.
[6] https://dailystormer.name/national-youth-fronts-operation-bully-board/.
[7] https://dailystormer.name/trolls-assemble-nro-raid-time-again/.
[8] https://dailystormer.name/empress-melania-attacked-by-filthy-russian-kike-julia-ioffe-in-gq/.

frequent target of the Daily Stormer. *See, e.g.*, Andrew Anglin, *Yale Jew Lawyer Confronts the Existential Threat of Alt-Right Shitposters*, Daily Stormer (June 2, 2016) (discussing "the Julia Ioffe operation" and then targeting Jewish attorney Yishai Schwartz's Twitter);[9] Radio Aryan, *The Stormer Report: Stormer Troll Army Triumphs Once Again*, Daily Stormer (May 2, 2016).[10]

- In May 2016, Anglin incited a troll storm against Jewish journalist Jonathan Weisman. First Am. Compl. ¶ 28; Terry Gross, *Attacked By Alt-Right Trolls, A Jewish Journalist Links Trump to The Rise of Hate*, NPR (March 19, 2018).[11]

- On May 3, 2016, Anglin instructed his followers to harass anyone interacting with an Old Navy public relations campaign on Twitter, because it was promoting interracial families. Andrew Anglin, *Old Navy Under Troll Assault for Encouraging Whites to Breed with Monkeys*, Daily Stormer (May 3, 2016).[12]

- On May 23, 2016, Anglin targeted Aubrey Perry because she criticized her parents for being racist and supporting then-candidate Donald Trump. "This is why women shouldn't be able to vote or have rights. They become de facto weapons of the Jew," he wrote, and instructed his followers to attack her on Twitter. "This is gonna be a big one." Andrew Anglin, *Trollable: Filthy Whore Aubrey Perry Publicly Disowns Her Parents for Supporting Trump*, Daily Stormer (May 23, 2016).[13]

---

[9] https://dailystormer.name/yale-jew-lawyer-confronts-the-existential-threat-of-alt-right-shitposters/.

[10] https://dailystormer.name/the-stormer-report-stormer-troll-army-triumphs-once-again/.

[11] https://www.npr.org/2018/03/19/594894657/attacked-by-alt-right-trolls-a-jewish-journalist-links-trump-to-the-rise-of-hate.

[12] https://dailystormer.name/old-navy-under-troll-assault-for-encouraging-whites-to-breed-with-monkeys/.

[13] https://dailystormer.name/trollable-filthy-whore-aubrey-perry-publicly-disowns-her-parents-for-supporting-trump/.

- Beginning on June 3, 2016, Anglin and other Daily Stormer authors published at least six articles inciting his followers to attack Jewish female congressional candidate Erin Schoede. First Am. Compl. ¶ 28; *see also* Zeiger and Andrew Anglin, *Hissing Jew Candidate Erin Schrode is Crying About the Troll Army*, Daily Stormer (June 6, 2016).[14] These actions may also violate federal criminal civil rights laws. *See, e.g.*, 18 U.S.C. §§ 241, 245.

- On June 5, 2016, Anglin discussed multiple online harassment campaigns targeting Jews that he promoted. "While our campaign against Julia Ioffe is being cited as the reason for [a recent Anti-Defamation League event], I think the campaign against Jonathan Weisman was much more instructive for the Jews." Andrew Anglin, *The Goyim Know – Convene the Council*, Daily Stormer (June 5, 2016).[15] He then called for online harassment of the ADL and several more individuals, including Danielle Citron, Steve Coll, Todd Gitlin, Shawn Henry, and Bethany Mandel. *Id*.

- On Aug. 15, 2016, Anglin retaliated against Jewish journalist Andrew Weinstein after Weinstein sought protection from the FBI for anti-Semitic abuse. Andrew Anglin, *Filthy Anti-Trump Kike Andrew Weinstein Reports "Anti-Semitic Abuse" to the FBI*, Daily Stormer (Aug. 15, 2016).[16]

- On Oct. 22, 2016, Anglin targeted journalist David French, his wife, and his two daughters; one daughter is African American and the other Anglin pejoratively accused of miscegenation. He then instructed his followers to troll French's wife on Instagram. In the same article, he also incited trolling of female writer Mickey White. First Am. Compl. ¶ 28.

---

[14] https://dailystormer.name/hissing-jew-candidate-erin-schrode-is-crying-about-the-troll-army/.
[15] https://dailystormer.name/the-goyim-know-convene-the-council/.
[16] https://dailystormer.name/filthy-anti-trump-kike-andrew-weinstein-reports-anti-semitic-abuse-to-the-fbi/.

- On November 9, 2016, Anglin listed tweets from over 50 individuals—including many people of color, women, and LGBTQ individuals—responding to the 2016 election results, observing, "You can troll these people and definitely get some of them to kill themselves." Andrew Anglin, *"I'm So Scared"*, Daily Stormer (Nov. 9, 2016).[17]

- Beginning in December 2016, Anglin and the Daily Stormer published 30 articles inciting a troll storm against Jewish female realtor Tanya Gersh and her family. Gersh sued Anglin on April 18, 2017. First Am. Compl. ¶¶ 25- 26; *Tanya Gersh v. Andrew Anglin*, Southern Poverty Law Center, https://www.splcenter.org/seeking-justice/case-docket/tanya-gersh-v-andrew-anglin (last visited March 12, 2019).

- On June 1, 2017, Anglin falsely claimed that Muslim comedian Dean Obeidallah was a terrorist responsible for an attack in England and asked readers to "confront" him. Obeidallah sued Anglin on August 16, 2017. First Am. Compl. ¶¶ 25, 27.

- On October 5, 2017, Anglin targeted Greg Morelli, owner of a Jewish deli, and shared the restaurant's address, in case "you feel a need to stop by and voice your concerns with this kike celebrating the slaughter of white men." Andrew Anglin, *TAKE ACTION: Another Jew Celebrating Vegas Deaths—Let's Tell Him What We Think of This!*, Daily Stormer (Oct. 5, 2017).[18] This occurred after a prominent online conspiracy theory called "Pizzagate" prompted a man to attack a Washington, DC pizza parlor with an assault rifle. *See* Cecilia Kang and Adam Goldman, *In Washington Pizzeria Attack, Fake News Brought Real Guns*, N.Y. Times (Dec. 5, 2016).[19]

---

[17] https://dailystormer.name/im-so-scared/.

[18] https://dailystormer.name/another-jew-celebrating-vegas-deaths/.

[19] https://www.nytimes.com/2016/12/05/business/media/comet-ping-pong-pizza-shooting-fake-news-consequences.html.

- On November 14, 2017, Anglin targeted Sarah Chamberlain, putting her name "on a list," because she was a white woman who had sexual relations with a black man. Andrew Anglin, *THOT=PATROLLED*, Daily Stormer (Nov. 14, 2017).[20]

- On April 22, 2018, Anglin wrote of a woman advocating restrictions on knives on campuses, "Bitch what you need is a punch in the fact that isn't symbolic or metaphorical[.]" First Am. Compl. ¶ 24.

- On October 12, 2018, "Azzmador"[21] reported on the operations of the "Stormer Book Club"[22] to spread neo-Nazi flyers depicting a Jewish conspiracy to stop then-Supreme Court nominee Brett Kavanaugh. The flyers were posted—in many instances by trespass to property or chattel—on or around synagogues, a Mormon institute, other houses of worship and religious centers, an African American's political campaign sign, Planned Parenthood, and college campuses. Azzmador, *Stormer Book Club's "Operation SCOTUS" a Smashing Success!*, Daily Stormer (Oct. 12, 2018).[23] Some of these incidents may violate federal criminal civil rights laws. *See, e.g.*, 18 U.S.C §§ 241, 245, 247.

---

[20] https://dailystormer.name/thotpatrolled/. "Thot" is an acronym for "that hoe over there" and is a derogatory and sexist term implying that a woman is promiscuous and sleazy. *See Thot*, Know Your Meme, https://knowyourmeme.com/memes/thot (last visited March 12, 2019).

[21] Azzmador is the pen name of Robert Warren Ray, a neo-Nazi from East Texas. Alexander Zaitchik, *The Brawler*, Southern Poverty Law Center (Aug. 5, 2018), https://www.splcenter.org/fighting-hate/intelligence-report/2018/brawler.

[22] Stormer Book Clubs are local chapters of Daily Stormer supporters that engage in real-world hateful acts. There are chapters across the country. Keegan Hankes, *Eye of the Stormer*, Southern Poverty Law Center (Feb. 9, 2017), https://www.splcenter.org/fighting-hate/intelligence-report/2017/eye-stormer; Zaitchik, *supra* n. 21.

[23] https://dailystormer.name/stormer-book-clubs-operation-scotus-a-smashing-success/.