# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| **TAYLOR DUMPSON,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| **v.** | ) |
|  | )    **Civil Action No. 18-1011 (RMC)** |
| **BRIAN ANDREW ADE,** | ) |
| **ANDREW ANGLIN, and** | ) |
| **MOONBASE HOLDINGS, LLC,** | ) |
|  | ) |
| **Defendants.** | ) |

_____  )

## MEMORANDUM OPINION

Taylor Dumpson filed this case against Brian Andrew Ade, Andrew Anglin, and Moonbase Holdings, LLC, for allegedly interfering with her right to full and equal enjoyment of places of public accommodation and an educational institution and for intentional infliction of emotional distress. Messrs. Ade and Anglin and Moonbase Holdings were served but failed to answer. Following the entry of default by the Clerk of Court, Ms. Dumpson moved for default judgment. Defendants failed to respond to her motion or the Court's Order to Show Cause why it should not be granted. The Court will grant her motion for default judgment; order compensatory damages in the amount of $101,429.28, punitive damages in the amount of $500,000, and attorneys' fees and costs in the amount of $124,022.10; enter a restraining order against Moonbase Holdings and Messrs. Anglin and Ade; and enter a preservation order against Mr. Anglin and Moonbase Holdings.

## I. FACTS

On May 1, 2017, one day after Ms. Dumpson was inaugurated as the first female, African-American student government president at American University (AU), a masked man

hung nooses with bananas inscribed with racist and derogatory messages around the AU campus, including near the Mary Graden Center, the student center which houses the AU Student Government offices. Am. Compl. [Dkt. 16] ¶¶ 51, 61, 63-64. It is alleged that the bananas were inscribed with phrases such as "AKA Free" (a reference to Ms. Dumpson's sorority, Alpha Kappa Alpha) and "Harambe bait" (a reference to a gorilla because comparing African Americans to apes is a common racist slur). *Id.* ¶ 64. Ms. Dumpson, AU, and law enforcement all believed Ms. Dumpson to be "the primary target of the hate crime." *Id.* ¶ 74.

After the media reported on this crime, Mr. Anglin posted an article about Ms. Dumpson on his website, the Daily Stormer,[1] writing: "No one feels safe around bananas. Some racists have taken to calling this African Queen 'Dumpy Dumpson,' smdh [shaking my damn head]." *Id.* ¶¶ 89-90. Mr. Anglin then published Ms. Dumpson's name, photo, and direct links to her Facebook account and the AU Student Government Twitter account with which Ms. Dumpson was associated as AU Student Government President. *Id.* ¶ 90. Mr. Anglin further directed his followers to "troll storm"[2] Ms. Dumpson, *id.* ¶ 2, encouraging them to troll Ms. Dumpson saying: "Be sure to send her some words of support on Facebook, and hit up the AU Student Government on Twitter. Let her know that you fully support her struggle against bananas." *Id.* ¶ 90.

---

[1] Mr. Anglin is the founder and publisher of the Daily Stormer. Am. Compl. ¶ 25. Mr. Anglin registered Moonbase Holdings, a for-profit, limited-liability corporation under the laws of the State of Ohio. *Id.* ¶ 30. Moonbase Holdings provides Mr. Anglin and the Daily Stormer with financial support. *Id.*

[2] "'Troll storms' involve the coordinated trolling of a person by multiple individuals via messages sent over social media platforms, postal mail, and phone." Am. Compl. ¶ 25 n.11. "Trolling is mocking, insulting, harassing, threatening, humiliating, defaming, and/or intimidating a targeted person through communications (typically, but not exclusively, online)." *Id.* ¶ 20.

After Mr. Anglin's article, Ms. Dumpson's Facebook accounts and the AU, AU Student Government, and AU Student Government President Twitter accounts were targeted with messages. *Id.* ¶ 97. Mr. Ade participated in the troll storm by posting on Twitter comments including: (1) "I beez prezdent n sheeeeit," (2) "Turdler takes a Dump son," (3) "OOOOOOK EEEEEK CHIMPOUT!," (4) "You beez 100% sheboon!," (5) "Sheeeeit I dindu nuffins she was axing fo it n sheeeit!," (6) "Racoons Rule, coons drool," (7) "Waah, waah, Dats Rayceez!," and (8) "Chimput!" *Id.* ¶ 100. In response to the AU Student Government's post about a campus community meeting regarding the incident, Mr. Ade responded, "[s]o in black people time, this will start whenever." *Id.*

After receiving the messages[3] from Mr. Ade and others, Ms. Dumpson began fearing for her life and suffering both physically and mentally. *Id.* ¶¶ 120-28. Ms. Dumpson felt constantly on edge when walking alone and became terrified of leaving her home at night. *Id.* ¶¶ 125-26. She started to carry an alarm on her keyring at all times and pepper spray for self-defense. *Id.* ¶ 125. Because she no longer felt comfortable to walk, bike, or take public transportation to commute to school and travel around town, she began to take Ubers more frequently. *Id.* ¶ 126. Ms. Dumpson's academics and preparation for law school also suffered as a result of the online harassment. She no longer felt safe studying late on AU's campus at night, missed exams, and dropped her minor in sociology. *Id.* ¶ 128. Ms. Dumpson also continues to feel scared of being harassed and stalked online which has interfered with her online presence and self-expression. *Id.* ¶ 127. From July 2017 to the present, Ms. Dumpson has been receiving regular psychiatric counseling. *Id.* ¶ 123. She was diagnosed with Post Traumatic Stress Disorder (PTSD), an eating disorder, depression, and anxiety; and she is now being treated for

---

[3] Ms. Dumpson provides more than thirty examples of messages. *See* Am. Compl. ¶¶ 99-118.

these conditions. *Id.* ¶¶ 124, 177. From June 2017 to January 2018, Ms. Dumpson lost an unhealthy amount of weight—more than 15% of her body weight—from the mental trauma stemming from the incident. *Id.* ¶ 121.

On April 30, 2018, Ms. Dumpson filed a Complaint against Messrs. Ade and Anglin, Moonbase Holdings, and James McCarty.[4] Compl. [Dkt. 1]. Moonbase Holdings and Messrs. Ade and Anglin failed to respond to the Complaint and the Clerk of Court entered default against each Defendant. *See* Clerk's Entry of Default as to Brian Andrew Ade [Dkt. 10]; Clerk's Entry of Default as to Moonbase Holdings, LLC [Dkt. 20]; Clerk's Entry of Default as to Andrew Anglin [Dkt. 28].

Ms. Dumpson now moves for default judgment against Messrs. Anglin and Ade and Moonbase Holdings for violations of the District of Columbia Human Rights Act of 1977 (DCHRA), D.C. Code § 2-1401.01 *et seq.*, and intentional infliction of emotional distress. *See* Mot. for Default J. (Mot.) [Dkt. 35]; Mem. in Supp. of Mot. for Default. J. (Mem.) [Dkt. 35-1]. Ms. Dumpson asks the Court to find Defendants jointly and severally liable for her injuries and requests compensatory damages, punitive damages, attorneys' fees, and injunctive relief. Mot. at 1-2. Defendants have not responded to Ms. Dumpson's Motion for Default Judgment or the Court's Order to Show Cause why default judgment should not be entered. *See* Order to Show Cause [Dkt. 39]. The motion is ripe for review.

## II. JURISDICTION AND VENUE

The Court has diversity jurisdiction over this action. *See* 28 U.S.C. § 1332(a). Ms. Dumpson is a citizen of Maryland, Am. Compl. ¶ 16; Mr. Anglin is a citizen of Ohio, *id.*

---

[4] The claims against Mr. McCarty were dismissed on January 25, 2019. *See* 1/25/19 Minute Order.

¶ 29; Moonbase Holdings is a limited-liability corporation registered in Ohio, *id.* ¶ 30; and Mr.

Ade is a citizen of Tennessee. *Id.* ¶ 33. Additionally, Ms. Dumpson's requested relief exceeds

$75,000. *Id.* ¶ 38. Venue is proper in this Court and the Court has personal jurisdiction over the

Defendants because the allegedly discriminatory statements were targeted at an individual that

attended school in, and activities that occurred in, the District of Columbia. *See* Fed. R. Civ. P.

4; D.C. Code § 13-423(a)(3); 28 U.S.C. § 1391(b)(2).

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 55

There is a two-step procedure for requesting default judgment. *Fanning v. Seneca*

*One Realty LLC*, 265 F. Supp. 3d 31, 33 (D.D.C. 2017) (citing *Boland v. Cacper Constr. Corp.*,

130 F. Supp. 3d 379, 382 (D.D.C. 2015)). First, Federal Rule of Civil Procedure 55(a) requires

the Clerk of Court to enter default "[w]hen a party against whom a judgment for affirmative

relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or

otherwise." Fed. R. Civ. P. 55(a). Second, once the Clerk has entered default, "the party must

apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2). A court may then enter

default judgment as established in Rule 55(b). *Id.* Determining whether default judgment is

appropriate "is committed to the discretion of the trial court." *Int'l Painters & Allied Trades*

*Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (citing

*Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).

"Default [judgment] establishes the defaulting party's liability for the well-

pleaded allegations of the complaint." *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d

64, 67 (D.D.C. 2011). To authorize default judgment, a "defendant must be considered a 'totally

unresponsive' party, and its default plainly willful, reflected by its failure to respond to the

summons and complaint, the entry of a default, or the motion for default judgment." *Int'l Painters*, 531 F. Supp. 2d at 57 (quoting *Gutierrez v. Berg Contracting Inc.*, No. 99-3044, 2000 WL 331721, at *1 (D.D.C. Mar. 20, 2000)). Given "the absence of any request to set aside the default or suggestion by the defendant that it has a meritorious defense," courts have found that the plaintiff has satisfied the standard for default judgment. *Id.* (quoting *Gutierrez*, 2000 WL 331721, at *1).

### B. Damages

Once the Court has established liability, "the court must make an independent evaluation of the damages to be awarded and has 'considerable latitude in determining the amount of damages.'" *Sanchez v. Devashish Hosp., LLC*, 322 F.R.D. 32, 35 (D.D.C. 2017) (quoting *Ventura v. L.A. Howard Constr. Co.*, 134 F. Supp. 3d 99, 103 (D.D.C. 2015) and *Elite Terrazzo Flooring*, 763 F. Supp. 2d at 67). To determine whether there is a basis to determine damages, "a plaintiff must 'prove [her] entitlement' to the relief requested using 'detailed affidavits or documentary evidence on which the court may rely.'" *Ventura*, 134 F. Supp. 3d at 103 (quoting *Boland v. Providence Constr. Corp.*, 304 F.R.D. 31, 36 (D.D.C. 2014)). "Ultimately, what matters is that the court 'ensures that there is a basis for the damages specified in the default judgment.'" *Pescatore v. Palmera Pineda*, 345 F. Supp. 3d 68, 71 (D.D.C. 2018) (quoting *Fanning v. Wegco, Inc.*, 5 F. Supp. 3d 1, 4 (D.D.C. 2013)). A court may conduct a hearing to set the amount of damages, *see* Fed. R. Civ. P. 55(b)(2), but it is not required to do so as long as there is a basis for the damages specified in the motion for default judgment. *See Ventura*, 134 F. Supp. 3d at 103.

## III. ANALYSIS

### A. Liability

Ms. Dumpson followed the two-step procedure that is required for default judgment. The Clerk of Court entered default against Moonbase Holdings and Messrs. Ade and Anglin and Ms. Dumpson applied to this Court for default judgment.[5] The Court has discretion to determine whether default judgment is appropriate and may enter default judgment on any well-pleaded allegations. *See Int'l Painters*, 531 F. Supp. 2d at 57. Courts consider whether the defendant is a "totally unresponsive" party, and its default plainly willful, reflected by its failure to respond to the summons and complaint, the entry of default, or the motion for default judgment. *Id.*

Having failed to file an answer, object to the entry of default by the Clerk, or respond to the Court's order to show cause why default judgment should not be entered against them, the Court finds Messrs. Ade and Anglin and Moonbase Holdings are totally unresponsive parties.

Ms. Dumpson complains that Messrs. Anglin and Ade and Moonbase Holdings interfered with her right to full and equal enjoyment of places of public accommodation, *see* Am. Compl. ¶¶ 129-44, 190-201 (Counts I and V), interfered with her right to equal opportunity to education, *see id.* ¶¶ 145-58, 202-09 (Counts II and VI), and caused intentional infliction of

---

[5] Mr. Ade was personally served on May 1, 2018 by Capitol Process Services, Inc. *See* Aff. of Service, Brian Andrew Ade [Dkt. 7] at 1. Moonbase Holdings was served by the Ohio Secretary of State on July 10, 2018. *See* Aff. of Service, Moonbase Holdings [Dkt. 13]. Mr. Anglin was served via publication and the final publication occurred on November 15, 2018. *See* Notice of Service by Publication [Dkt. 23].

emotional distress.  *See id*. ¶¶ 178-89, 228-36 (Counts IV and VIII).[6]  The Court will review the allegations for each count in turn to ensure they are well-plead and justify default judgment.

### 1. *Interference with Places of Public Accommodation (Counts I and V)*[7]

In the District of Columbia, every individual has the right to "an equal opportunity to participate in all aspects of life, including, but not limited to . . . in places of public accommodation."  D.C. Code § 2-1402.01.  It is unlawful to directly or indirectly deny any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations on the basis of a variety of factors including race and gender.  *See id*. § 2-1402.31.  It is unlawful for any individual "to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected" under the DCHRA.  *Id*. § 2-1402.61.  An individual may not "aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the [DCHRA] or . . . attempt to do so."  *Id*. § 2-1402.62.  "To establish a prima facie case of . . . interference, a plaintiff must allege that:  (1) [s]he engaged in activity protected under the DCHRA . . . ; (2) [s]he was subjected to adverse action; and (3) there is a causal nexus between the two."  *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 12 (D.D.C. 2006) (citing *Carter-Obayuwana v. Howard Univ.*, 764 A.2d 779, 790 (D.C. 2001)).

---

[6] Ms. Dumpson does not move for default judgment on Counts III and VII, alleging bias-related incitement of and/or conspiracy to commit stalking.  *See* Am. Compl. ¶¶ 159-77, 210-27; Mem. at 10 n.3.

[7] The same *prima facia* test applies to interference with public accommodation and interference with educational institution claims.  American University is both a place of public accommodation and an educational institution.  Therefore, for the same reasons the Court finds Counts I and V well-plead, Counts II and VI are also sufficient to justify default judgment.

a.   Mr. Anglin/Moonbase Holdings (Count I)[8]

Ms. Dumpson alleges that Mr. Anglin and Moonbase Holdings invited interference and interfered with her right to full and equal enjoyment of places of public accommodation, specifically the AU campus.  Am. Compl. ¶¶ 129-44 (Count I).  Ms. Dumpson alleges that she was engaged in a protected activity under the DCHRA by using the resources on the AU campus.  *See id*. ¶¶ 131-32.  The DCHRA defines places of public accommodation as "restaurants or eating houses, or any place where food is sold for consumption on the premises; . . . establishments dealing with goods or services of any kind . . . ; swimming pools, . . . amusement and recreation parks, . . . gymnasiums, . . . garages, . . . [and] public halls and public elevators."  D.C. Code 2-1401.02(24).  AU is considered a place of public accommodation under the DCHRA because it has restaurants, other places where food is sold, establishments dealing with good or services, swimming pools, gymnasiums and recreational parks, garages, and buildings with public halls and elevators that are available to AU students and the public.  Am. Compl. ¶¶ 134-35.  Additionally, the lampposts the bananas were hung from were near the Mary Graden Center, the student center where the AU Student Government offices are located.  *Id.* ¶ 135.  The Mary Graden Center is centrally located on campus near the gym and bookstore and holds restaurants open to the public.  *Id.*

Ms. Dumpson alleges that the troll storm initiated by Mr. Anglin and Moonbase Holdings interfered with her enjoyment of places of public accommodation.  *See id*. ¶¶ 138-41.  The harassment targeted her because of her race and gender, *see id*. ¶ 138, and affected her use and enjoyment of the AU campus because she no longer felt safe on campus in the way she had

---

[8] Because Mr. Anglin is the registered agent, founder, and publisher of Moonbase Holdings, and thus exercises control over the company, the Court considers these Defendants together.  *See* Am. Compl. ¶ 30.

previously. *See id*. ¶ 144. This negatively impacted Ms. Dumpson's academic experience and ability to socialize on the AU campus. *Id.* By inviting readers of the Daily Stormer to troll Ms. Dumpson, Mr. Anglin and Moonbase Holdings also encouraged others to interfere with her enjoyment of AU. *Id.* ¶ 150. Mr. Anglin and Moonbase Holdings interfered with Ms. Dumpson's access and enjoyment of AU by causing Ms. Dumpson to feel constantly unsafe as a result of Mr. Anglin and Moonbase Holdings' threatening messages and the messages they urged other to send. The Court finds that a casual nexus exists between the troll storm created by Mr. Anglin and Moonbase Holdings and Ms. Dumpson's enjoyment of AU and its resources and that Ms. Dumpson was targeted because of her race and gender.

b. Mr. Ade (Count V)

Ms. Dumpson alleges that Mr. Ade aided and abetted interference with her right to full and equal enjoyment of AU's campus. *Id*. ¶ 198. Mr. Ade's participation in the troll storm contributed to Ms. Dumpson's fear and lack of safety. *Id*. ¶ 201. Mr. Ade's tweets also demonstrate that the basis of the interference was Ms. Dumpson's race and gender because they refer to Ms. Dumpson as a "sheeboon" and make additional comparisons to Ms. Dumpson and apes.[9] *Id.* ¶¶ 100, 143. Mr. Ades's actions therefore constitute interference with Ms. Dumpson's enjoyment of a place of public accommodation. A casual nexus existed between the troll storm, to which Mr. Ade added, and Ms. Dumpson's enjoyment of AU.

2. *Intentional Infliction of Emotional Distress (Counts IV and VIII)*

Under D.C. law, to state a claim of intentional infliction of emotional distress, the plaintiff must show "'(1) extreme and outrageous conduct on the part of the defendant which (2)

---

[9] "Comparing African Americans to apes or monkeys is a common form of racist insult used to dehumanize, belittle, or intimidate African Americans." Am. Compl. ¶ 66.

intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Paul v. Howard Univ.*, 754 A.2d 297, 307 (D.C. 2000) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007).

> In deciding whether alleged conduct is "extreme and outrageous," the court must consider: "(1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place." The "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," although statements that were considered a "petty oppression," "trivial" or merely "inconsiderate and unkind" fifty years ago may be "extreme and outrageous" conduct under "today's social standards and principles (or vice-versa)." Courts have applied a balancing test to determine whether the alleged conduct "violates prevailing social norms and is sufficiently outrageous to ensure that the advantage to society of preventing such harm seems greater than the advantage of leaving ill-disposed persons free to seek their happiness in inflicting it."

*Burnett v. Am. Fed'n of Gov't Emps.*, 102 F. Supp. 3d 183, 190 (D.D.C. 2015) (quoting *King v. Kidd*, 640 A.2d 656, 668-69 (D.C. 1993)). "Creation of a hostile . . . environment by racial or sexual harassment may, upon sufficient evidence, constitute a prima facie case of intentional infliction of emotional distress." *Best*, 484 A.2d at 986. "'Repeated harassment . . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability.'" *Id.* (quoting *Boyle v. Wenk*, 392 N.E.2d 1053, 1056 (Mass. 1979)).

a. Mr. Anglin/Moonbase Holdings (Count IV)

Ms. Dumpson alleges that Mr. Anglin's article which mocked the noose incident and encouraged people to troll storm her was intended to inflict emotional distress. Am. Compl. ¶¶ 181-82. The encouraged harassment and online attacks ridiculed her because of her race and

gender, which she alleges was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be intolerable in a civilized society. *Id.* ¶ 180.

The Court finds the evidence clear and unrebutted that Mr. Anglin and Moonbase Holdings' actions were racially motivated and intentionally resulted in a campaign of racial and gender harassment. Mr. Anglin wrote, and Moonbase Holdings distributed, multiple comments which mocked Ms. Dumpson and the noose incident, such as suggesting that she had a "struggle with bananas," and encouraging others to target, harass, and attack her online because she is an African-American woman. *See* Am. Compl. ¶¶ 90, 180. Furthermore, Mr. Anglin and Moonbase Holdings' discriminatory actions resulted in more than thirty messages by Daily Stormer followers over at least two months. *See id.* ¶¶ 86, 99-118. This conduct went well beyond "mere insults" or "inconsiderate and unkind" behavior. *Burnett*, 102 F. Supp. 3d at 190. The extent of the troll storm was significant and Mr. Anglin, through the Daily Stormer, intended that result or was reckless in his actions.

Ms. Dumpson alleges that she suffered severe emotional distress as a direct result of Mr. Anglin and Moonbase Holdings' article and the resulting harassment, including PTSD, an eating disorder, depression, and anxiety. *Id.* ¶ 182. Ms. Dumpson's claims are supported by detailed affidavits and exhibits by which her doctor explains Ms. Dumpson's symptoms and treatment. *See* Ex. 1, Mot., Decl. of Taylor Dumpson (Dumpson Decl.) [Dkt. 35-2] ¶¶ 23-33 (detailing the effects of the harassment); Ex 2, Mot., Decl. of Michael Mintz, Psy. D. (Mintz Decl.) [Dkt. 35-3] (Sealed version of psychological evaluation filed at Dkt. 37.). The Court finds that Ms. Dumpson has met her burden for satisfying the three elements of a claim of intentional infliction of emotional distress: Mr. Anglin and Moonbase Holdings participated in extreme and outrageous conduct, Ms. Dumpson suffered severe emotional distress, and Mr. Anglin and

Moonbase Holdings' conduct intentionally or recklessly caused Ms. Dumpson's emotional distress.

      b.  Mr. Ade (Count VIII)

Ms. Dumpson alleges that Mr. Ade's posts were specifically intended to harass and inflict emotional distress. Am. Compl. ¶ 233. Mr. Ade repeatedly posted derogatory messages about Ms. Dumpson, an African-American woman and student, due to her race and gender. Ms. Dumpson alleges that posting his comments on the Internet for the public to see constituted extreme and outrageous conduct. *Id.* ¶ 231. The Court finds that Mr. Ade's comments were severely derogatory due to Ms. Dumpson's race and gender and were not, by any stretch of the imagination, merely a few isolated statements. Mr. Ade posted nine different tweets which included posts in which he compared Ms. Dumpson to a gorilla, chimp, and "sheboon." *Id.* ¶ 100. The Court finds Mr. Ade's messages constituted an intentional campaign of discrimination based on Ms. Dumpson's race and gender. Such remarks regarding race and gender went far beyond the bounds of decency and were intolerable to the average or reasonable person in a civilized society, much less a university.

Mr. Ade participated in the troll storm initiated by Mr. Anglin and Moonbase Holdings and intentionally or recklessly directed numerous tweets at Ms. Dumpson. Ms. Dumpson stated that as a direct result of Mr. Ade's tweets, she suffered severe emotional distress. *Id.* ¶ 234. The Court finds that Ms. Dumpson has met her burden of alleging and demonstrating a claim of intentional infliction of emotional distress: Mr. Ade participated in extreme and outrageous conduct, Ms. Dumpson suffered severe emotional distress, and Mr. Ade's conduct intentionally or recklessly caused Ms. Dumpson's emotional distress.

### 3. Conclusion

Ms. Dumpson has presented well-plead claims against Moonbase Holdings and Messrs. Anglin and Ade for interference with Ms. Dumpson's right to full and equal enjoyment of places of public accommodation and an educational institution and intentional infliction of emotional distress. Because Moonbase Holdings and Messrs. Anglin and Ade have not responded, default judgment will be entered.

### B. Damages

#### 1. Compensatory Damages[10]

Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (quotation marks and citation omitted). They "make plaintiffs whole for the harms that they have suffered as a result of defendants' actions." *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 945 F. Supp. 2d 81, 85 (D.D.C. 2013) (quoting *Hendry v. Pelland*, 73 F.3d 397, 402 (D.C. Cir. 1996)). Compensatory damages include economic damages, which are a concrete loss, and damages for "pain, suffering, and mental anguish" for which the amount of damages is not a sum certain. *Robinson v. Ergo Sols., LLC*, 4 F. Supp. 3d 171, 178 (D.D.C. 2014). In these default circumstances, a court has latitude in determining an award of compensatory damages and may do so after an independent evaluation. *See Sanchez*, 322 F.R.D. at 35. Joint and several liability is proper when defendants' "independent acts combined to cause a single injury." *District of Columbia v. Wash. Hosp. Ctr.*, 722 A.2d 332, 336-37 (D.C. 1998); *see also Fred A. Smith Mgmt. Co. v. Cerpe*, 957 A.2d 907,

---

[10] Plaintiffs may recover compensatory damages for emotional pain and suffering under the DCHRA. *See Sumes v. Andres*, 938 F. Supp. 9, 13 (D.D.C. 1996).

917 (D.C. 2008) (finding defendants jointly and severally liable for attorneys' fees under the DCHRA because the defendants' liability "arose out of a common nucleus of facts and issues").

This Court concludes that under D.C. law, and the record here, Messrs. Anglin and Ade and Moonbase Holdings are jointly and severally liable for compensatory damages to Ms. Dumpson because their liability arose from the troll storm initiated by Mr. Anglin and Moonbase and joined by Mr. Ade and their intentional collective actions combined to cause Ms. Dumpson's injuries. Ms. Dumpson has submitted detailed affidavits and exhibits explaining her pain and suffering and the resulting psychiatric treatment. *See* Dumpson Decl. ¶¶ 23-33; Mintz Decl. and Exhibits. The Court finds that Ms. Dumpson has established a concreate loss of $844.76 for the cost of therapy and medication and $584.52 for the cost of Uber to travel to school and her internship which fear caused her to need after the troll storm.

Ms. Dumpson also requests $100,000 for pain and suffering. Since the incident, Ms. Dumpson has experienced "flashbacks, nightmares, depression, anxiety, and disordered eating, and engaged in avoidance behavior." Am. Compl. ¶ 122. She requires regular therapy and has been diagnosed with PTSD. *Id.* ¶ 124. Ms. Dumpson's emotional distress was caused by Mr. Anglin and Moonbase Holdings' article, which led to the troll storm in which Mr. Ade participated. Their combined actions caused Ms. Dumpson's emotional distress. The Court finds Messrs. Ade and Anglin and Moonbase Holdings jointly and severally liable for $101,429.28 in compensatory damages.

### 2. Punitive Damages

"[P]unitive damages are available in all discrimination cases under the DCHRA, 'subject only to the general principles governing any award of punitive damages.'" *Daka, Inc. v. Breiner*, 711 A.2d 86, 98 (D.C. 1998) (quoting *Arthur Young & Co. v. Sutherland*, 631 A.2d 354,

372 (D.C. 1993)) (emphasis omitted).  The purpose of punitive damages is to punish bad acts and deter repetition.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 567 (1996).  Courts may award punitive damages only when the defendant acted with an "evil motive or actual malice."  *Daka*, 711 A.2d at 98 (citation and quotation marks omitted).  An evil motive "goes beyond a mere intention to be annoying or unpleasant."  *Id*. (citing *Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.*, 492 A.2d 580, 593 (D.C. 1985) (stating that punitive damages are intended to punish "outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights")).  "Direct evidence of malicious intent is not required; malice and wrongful motive may be inferred from the acts of a party and circumstantial evidence."  *Vassiliades*, 492 A.2d at 593.

Having found above that the actions of Messrs Anglin and Ade and Moonbase Holdings were outrageous and resulted in liability for intentional infliction of emotional distress, the Court also finds the behavior was sufficiently wanton and willful to justify punitive damages.  Ms. Dumpson requests $1,500,000 in punitive damages, but the Court finds that amount is excessive and will instead award $500,000, which is more in line with other courts in this jurisdiction and reflective of the outrageous conduct here.  *See, e.g.*, *Doe v. De Amigos*, No. 11-1755, 2014 WL 12785325, at *18 (D.D.C. June 10, 2014), *report and recommendation adopted*, 2014 WL 2937781 (D.D.C. July 1, 2014) (awarding plaintiff $300,000 in punitive damages despite a request for $2,000,000 in a case alleging intentional infliction of emotional distress).

3. *Injunctive Relief*[11]

"Injunctive relief is committed to the sound discretion of the trial court." *Ifill v. District of Columbia*, 665 A.2d 185, 187 (D.C. 1995). A permanent injunction requires the court to find that "there is no adequate remedy at law, the balance of equities favors the moving party, and success on the merits has been demonstrated." *Id.* at 188 (citation and quotation marks omitted); *see also Universal Shipping Co. v. United States*, 652 F. Supp. 668, 675-76 (D.D.C. 1987) ("The Court must look at the interests of the parties who might be affected by the [injunction] and must also examine whether the facts and the relevant law indicate that an injunction clearly should be granted or denied apart from any countervailing interest.").

Ms. Dumpson requests two types of permanent injunctive relief—a restraining order and an order requiring preservation of all property associated with the Daily Stormer and Ms. Dumpson until the Judgment in this case has been collected. The Court will grant Ms. Dumpson's requests for permanent injunctive relief. She has succeeded on the merits due to this Court's pending entry of default judgment and the balance of equities favors Ms. Dumpson. The requested restraining order is specifically targeted at speech related to Ms. Dumpson and will not unnecessarily restrict the Defendants' freedom of speech or cause other harm. Injunctive relief is also warranted because there is no adequate remedy at law. Although without a restraining and preservation order Ms. Dumpson could sue post hoc for damages if Defendants chose to target her again, the Court finds such a remedy uncertain and insufficient.

The Court will enter a restraining order to prevent Messrs. Ade and Anglin and Moonbase Holdings from (1) communicating directly with Ms. Dumpson; or (2) publishing any public statements involving Ms. Dumpson that (a) are defamatory, threatening, intimidating,

---

[11] The DCHRA permits injunctive relief. *See* D.C. Code § 2-1403.07.

harassing, or bullying; (b) interfere with Ms. Dumpson's equal enjoyment of public accommodations; (c) incite unlawful acts; or (d) are otherwise unlawful. The Court will also order Mr. Anglin and Moonbase Holdings to preserve all property—including intellectual property—associated with The Daily Stormer until Ms. Dumpson has fully collected the Judgment awarded by this Court.

### 4. Attorneys' Fees

If a defendant violates the DCHRA, the Court may grant any relief it believes is appropriate, including reasonable attorneys' fees. *See* D.C. Code § 2-1403.13(a)(1)(E). The Court's assessment of attorneys' fees follows the market value methodology adopted by the D.C. Circuit: "the number of hours reasonably devoted to the litigation [is] multiplied by a reasonable hourly rate." *Laffey v. Nw. Airlines, Inc.*, 746 F.2d 4, 12-13 (D.C. Cir. 1984). Since *Laffey*, the Civil Division of the United States Attorney's Office in the District of Columbia has maintained a matrix of the prevailing hourly rates in the region. *See Lively v. Flexible Packaging Ass'n*, 930 A.2d 984, 988-89 (D.C. 2007); *see also Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n.14, 1109 (D.C. Cir. 1995) (finding that parties may rely on the updated *Laffey* Matrix prepared by the United States Attorney's Office for the District of Columbia (USAO) as indication of prevailing market rates for litigation counsel in the Washington, D.C. area). Having succeeded on the merits of the case, *see Goos v. Nat'l Ass'n of Realtors*, 997 F.2d 1565, 1568 (D.C. Cir. 1993) ("The most critical factor in determining the reasonableness of a fee award is the degree of success obtained."), Ms. Dumpson is entitled to reasonable attorneys' fees. A specific fee may be adjusted upward or downward to reflect the characteristics of the specific case and counsel for which the award is sought. Because the calculations based on this

methodology can be inherently imprecise and require estimates, the Court must exercise its discretion to arrive at the final fee award.

The Court has reviewed the declarations and exhibits provided by counsel and finds the time expended and resources used were reasonable. *See* Ex. 3, Mot., Decl. of Jon M. Greenbaum of the Lawyers' Committee for Civil Rights Under Law [Dkt. 35-4]; Ex. 4, Mot., Decl. of Dennis A. Corkery (Washington Lawyers' Committee for Civil Rights) [Dkt. 35-5]; Ex. 5, Mot., Decl. of Ragan Naresh (Kirkland & Ellis) [Dkt. 35-6]. Counsel used the current *Laffey* Matrix to calculate their fees, kept precise records of their time and the tasks completed, and did not bill for duplicative efforts. The Court will award The Lawyers' Committee for Civil Rights $105,114 in attorneys' fees and $388.05 in costs; Washington Lawyers' Committee for Civil Rights and Urban Affairs $11,635 in attorneys' fees; and Kirkland and Ellis, LLP $6,885.05 in fees and costs to cover the expert report, service, and filing.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Ms. Dumpson's motion for default judgment against Moonbase Holdings and Messrs. Anglin and Ade. The Court will also order compensatory damages in the amount of $101,429.28, punitive damages in the amount of $500,000, and attorneys' fees and costs in the amount of $124,022.10. Finally, the Court will enter a restraining order against Moonbase Holdings and Messrs. Anglin and Ade and enter a preservation order against Mr. Anglin and Moonbase Holdings. A memorializing Order accompanies this Memorandum Opinion.


Date: August 9, 2019                          _____
                                              ROSEMARY M. COLLYER
                                              United States District Judge